62-CV-14-6758

Filed in Second Judicial District Court
11/7/2014 4:10:52 PM
Ramsey County Civil, MN

**STATE OF MINNESOTA**

**COUNTY OF RAMSEY**

**DISTRICT COURT**

**SECOND JUDICIAL DISTRICT**

|  |  |
|---|---|
| Sunrise Banks, N.A.,<br><br>     Plaintiff,<br>vs.<br><br>Card Express, Inc., and Alan Safahi,<br><br>     Defendants. | Court File No.: 62-CV-14-6758<br><br>Case Type: Contract/Tort<br><br>**AMENDED COMPLAINT** |

Sunrise Banks, N.A. ("Sunrise"), for its Amended Complaint against Card Express, Inc. ("CardEx") and its founder, principal and chief executive officer, Alan Safahi ("Safahi"), states and alleges as follows:

### INTRODUCTION

1. CardEx markets and processes prepaid cards for companies that give the cards to employees and customers as part of loyalty and rewards programs. Sunrise, a national banking association, issues the prepaid cards and CardEx "loads" the cards—meaning that CardEx programs a monetary value onto each card to cover cardholder transactions. Funding of the loads is provided by the sponsor companies.

2. Under an agreement between the parties, CardEx was to hold in trust and immediately transfer to Sunrise any money it received from sponsor companies to fund the prepaid cards.

3.     CardEx, by and through Safahi, loaded nearly $3 million onto prepaid cards, but did not fund those cards by delivering to Sunrise the funds provided to CardEx and/or Safahi by the sponsor companies.

4.     CardEx's actions and those of its founder, principal and chief executive officer Safahi have caused and are continuing to cause Sunrise severe and irreparable damage.

5.     Among other relief, Sunrise seeks permanent injunctive relief preventing CardEx and Safahi from: (1) making representations regarding the amount of balances on prepaid cards issued by Sunrise; (2) distributing any prepaid cards issued by Sunrise; (3) representing that CardEx has authority to collect money on behalf of Sunrise or to fund prepaid cards issued by Sunrise; or (4) using the Sunrise logo or representing that CardEx is associated with Sunrise. Sunrise also asks that the Court order CardEx and Safahi to immediately deliver to Sunrise any and all funds held by CardEx and Safahi, in trust for Sunrise or otherwise, and to immediately return to Sunrise all prepaid cards associated with Sunrise in their possession.

6.     Sunrise also seeks to recover the damages caused to Sunrise by CardEx and Safahi.

## PARTIES

7.     Plaintiff Sunrise is a national banking association with its principal place of business at 200 University Avenue West, Saint Paul, Minnesota 55103.

8.     Defendant CardEx is a California corporation with its principal place of business at 182 Howard St., #409, San Francisco, California 94105.

2

9.     Alan Safahi is the founder, principal and chief executive officer of CardEx. Upon information and belief, he is a resident of California.

## JURISDICTION

10.     This Court has jurisdiction over the action because in the agreement governing the parties' rights and obligations, the parties agreed to submit to the jurisdiction of Minnesota courts and to waive any objection to venue in Minnesota.  (*See* Agreement § 13.7.)

## FACTS

**A.     The Relationship Between Sunrise and CardEx.**

11.     Sunrise is a national banking association that is a member of Visa and MasterCard networks through a variety of different programs marketed on a national basis. Sunrise regularly contracts with third-party companies that assist Sunrise in developing and marketing the prepaid card programs.

12.     CardEx markets, distributes, and administers electronic payment processing solutions, including prepaid cards and prepaid card-related systems and services.   In general, CardEx contracts with businesses (known as "Sponsors") to provide prepaid cards for use in corporate incentive, loyalty, and rewards programs. CardEx works with banks like Sunrise to facilitate the prepaid card programs that it offers to Sponsors.

13.     CardEx and Sunrise entered into the Prepaid Card Program and Processing Agreement ("Agreement"), dated June 21, 2013. A true and correct copy of the Agreement is attached as Exhibit A hereto.

3

14.     In programs established under the Agreement, CardEx entered into agreements with Sponsors and provided prepaid cards to Sponsors, often embossed with the Sponsor's logo and design. At least some of those prepaid cards identified Sunrise as the issuing bank. Sponsors would determine the guidelines for when certain employees, customers, or sales representatives should be awarded a prepaid card, and would provide the funds to load those cards to CardEx.

15.     On information and belief, the Sponsor would tell CardEx where to send the prepaid cards and how much money to load onto the cards. The Sponsor would then provide CardEx with funds for the amounts to be loaded on the cards and also pay CardEx agreed-upon fees and costs. CardEx, in turn, was required to transfer any funds that needed to be loaded onto the cards to Sunrise.

**B.     CardEx Must Immediately Deliver Funds Received from Sponsors to Sunrise.**

16.     CardEx expressly agreed to immediately transfer to Sunrise all funds that it received from Sponsors that were intended to fund prepaid cards issued by Sunrise. (*See* Agreement § 2.6.)

17.     CardEx expressly agreed to be responsible for any failure to deliver to Sunrise funds intended for the funding of prepaid cards. (*See id.* § 3.10.) If such a load failure occurred, CardEx agreed to "fully fund any shortfall." (*Id.*)

18.     CardEx expressly agreed to hold "Load Amounts" (i.e., funds received from Sponsors and designated for prepaid cards) "in trust for the Bank (i.e. statutory trust) and for the benefit of the applicable Cardholder, and no part of such Load Amounts shall be deemed the property of, or asset of, [CardEx]". (*Id.* § 3.11)

4

19.    CardEx and Safahi provided to Sunrise two sets of daily reports with data regarding the card accounts issued by Sunrise. These reports, which are standard industry reports provided by a processor to an issuing bank, included the funding report (noting dollars loaded to the cards) and a flat data file, which generally notes all processing information available regarding each cardholder account in an unorganized fashion (the "Flat Files").

## C.    CardEx Fails to Meet Its Obligations Under the Agreement.

20.    CardEx launched its first program under the Agreement on or about October 28, 2013.

21.    But CardEx failed to honor the Agreement, and there were numerous technical issues. Among other things, CardEx failed to provide Sunrise with the ability to view cardholder accounts, as required by the Agreement. (*See id.* at § 3.12 and Exhibit C to the Agreement, §(n)). The Flat Files provided by CardEx also did not consistently match the funding reports, a discrepancy that CardEx and Safahi urged Sunrise to ignore; CardEx and Safahi claimed that the matching problems were caused by an issue with its information technology. CardEx also changed gateway processors (the larger processor through which CardEx connected to the MasterCard system) after Sunrise declined to approve the proposed change. The change to the new gateway processor caused additional balancing, report timing, and reconciliation issues. Moreover, CardEx did not provide Sunrise required access to its systems. CardEx attempted to give Sunrise access via VPN, but this was unacceptable to and unworkable for Sunrise due to security issues surrounding this type of access.

5

22.   Because of the recurring technical issues with CardEx's reporting, on April 7, 2014, Sunrise sent CardEx a breach of contract notification outlining the contract violations and providing 30 days to cure. CardEx and Safahi informed Sunrise it was attempting to replace Sunrise with another bank to enable it to move its business away from Sunrise, and Sunrise agreed to work with CardEx to facilitate that transition. On June 26, 2014, Safahi informed Sunrise that he had a signed agreement with another bank and would be working to move his business to that bank as quickly as possible. Safahi later told Sunrise that the agreement fell through because the new bank refused to work with the gateway processor to which CardEx had changed without Sunrise's approval.

23.   Because various breaches were not cured, on August 7, 2014, Sunrise sent a Notice of Termination of the Agreement to CardEx and offered to work with CardEx on an orderly wind-down of the relationship.

24.   After receiving the Notice of Termination, Safahi attempted to negotiate a long-term wind-down of the relationship with Sunrise through June 30, 2015.

25.   On August 20, 2014, Sunrise informed Safahi that the proposed wind-down schedule was unacceptable. Sunrise further informed him that CardEx had to find a replacement bank by October 17, 2014, that Sunrise would not approve any new card programs, and that Sunrise would not allow the issuance of any new cardholder accounts under existing programs after February 17, 2015. On September 11, 2014, after further negotiations, Sunrise provided CardEx with a formal written wind-down agreement and advised CardEx that the agreement was the Bank's final offer.

26.     Between the Notice of Termination on August 7, 2014, and Friday, September 19, 2014, CardEx and Safahi continued to fund prepaid cards and provide daily funding reports to Sunrise.

**D.     CardEx Purports to Fund Pre-Paid Cards with $2.9 Million But Delivers No Funds to Sunrise.**

27.     CardEx did not provide the required processing reports or funding for loads to prepaid cards on Monday, September 22 or Tuesday, September 23, 2014. By the morning of Wednesday, September 24, 2014, the Sunrise accounts CardEx funded to support the prepaid cards were overdrawn.

28.     In the morning of September 24, Sunrise demanded the reporting and funding from CardEx and Safahi. The Flat Files that Sunrise received on September 24 showed that CardEx had loaded $2,911,901.56 to cardholder accounts between September 19 and September 24. These loads were materially and substantially in excess of any prior loads ever made by CardEx in a comparable time period.

29.     On September 24, despite having just loaded an extraordinary and alarming sum of money onto cards, Safahi told Sunrise that CardEx was out of money and that he was shutting CardEx down, and he referred Sunrise to CardEx's legal counsel.

30.     Even though the Agreement required CardEx to immediately transfer funds to Sunrise to cover these new load amounts, and even though CardEx and Safahi had likely previously received from the Sponsors the money to fund these loads, neither CardEx nor Safahi ever delivered any additional funds to Sunrise.

31.     The Flat Files indicated that CardEx and Safahi represented to Sponsors that $2,911,901.56 had been loaded onto what were in fact unfunded cards. On September 24, 2014, Sunrise terminated CardEx and Safahi's ability to open and load cardholder accounts. To eliminate the risk of additional unfunded loads, Sunrise also terminated already-issued cards.

32.     Almost immediately, Sunrise began receiving calls from cardholders and Sponsors regarding the terminated and unfunded cards, in part because CardEx and Safahi unilaterally routed CardEx's customer-service number to Sunrise's general bank telephone number.

33.     CardEx and Safahi committed fraud on the Sponsors and kept and converted funds that were supposed to have been loaded to prepaid cards and delivered to Sunrise. In numerous calls with cardholders, Sunrise has learned that cardholders believed that their prepaid cards had higher balances than they actually did. Sponsors have also reported that the funds they provided to CardEx and Safahi for loading onto cards are significantly greater than the funds that Sunrise received from CardEx to support Safahi's loads onto CardEx's cards.

34.     Sunrise has since learned that CardEx and Safahi sent falsified funding reports and Flat Files to Sunrise. In those falsified reports, CardEx and Safahi intentionally misrepresented information about the amount of funds that Sponsors had provided to CardEx and Safahi loaded onto cards. CardEx and Safahi accepted funds from Sponsors, stole or otherwise converted a portion of the funds (which were supposed to have been held in trust for cardholders), and then lied to Sunrise about the load

8

amounts by falsifying the funding reports and Flat Files that they sent to Sunrise. Had Sunrise known that CardEx and Safahi were falsifying funding reports and Flat Files, Sunrise would have immediately terminated its relationship with CardEx. CardEx and Safahi's fraud was not exposed until September 24, 2014, when CardEx and Safahi attempted to "load" $2,911,901.56 on prepaid cards for which no funds existed.

35.    On September 25, 2014, one day after informing Sunrise that CardEx was shutting down, Safahi sent a mass email to Sponsors. In that email, despite CardEx and Safahi having stolen or otherwise converted funds that were promised to be held in trust for the cardholders, and knowing that CardEx never provided those funds to Sunrise, Safahi wrote "Our discussions with Sunrise Bank did not get anywhere. Their legal steadfastly refuses to accept responsibility for their own card holders." He cited MasterCard Regulations, and continued "At this point, we assume that Sunrise will not reactivate the cards (even though we offered them the option of using our platform at no additional cost). We will therefore focus our efforts in getting MasterCard to step in and force them to issue refund checks." Safahi then stated CardEx would refer all calls to the phone number on Sunrise's website and concluded "We hope that they will follow the proper protocol which is to get the cardholder info and process a refund check within 10-15 days." In other words, Safahi purposefully and falsely told Sponsors and cardholders that CardEx had deposited their funds at Sunrise, and that Sunrise was wrongfully withholding those funds. Sunrise was forced to devote substantial resources to responding to Sponsors and cardholders inquiries and has suffered severe reputational harm as a result of Safahi's false statements.

9

36.     Even after shutting down its operations, CardEx and Safahi continued to provide erroneous information about card balances to Sponsors and cardholders and to facilitate unfunded rewards redemptions. CardEx maintained a Web site or Web sites, as well as an interactive voice recognition system ("IVR System"), which allowed cardholders to check card balances, review transaction histories, and, in connection with some sponsor programs, redeem rewards points under a CardEx rewards program to buy merchandise or load funds to their prepaid cards.

37.     Sponsors and cardholders have expressed dismay and frustration with Sunrise, and Sunrise's reputation has consequently been damaged. Sunrise's reputation continues to be damaged as CardEx and Safahi continue to misrepresent prepaid card balances and their association with Sunrise.

38.     CardEx and Safahi have caused Sunrise significant monetary damages because Sunrise has been forced to spend substantial sums and devote significant resources to respond to CardEx's actions.

**E.     CardEx is a Façade Used by Safahi to Obtain Access to a Flow of Cash, Which He Has Used for His Own Personal Benefit.**

39.     CardEx is the alter ego of Safahi. Safahi is the founder, principal and chief executive officer of CardEx. He is the main point of contact for the company. He personally engaged in numerous conversations with Sunrise, and he sent the email that Sunrise was shutting down and the defamatory email to Sponsors. After CardEx shut down, Sunrise learned that CardEx and/or Safahi had received significantly more funds from Sponsors than they had reported or delivered to Sunrise, and provided false reports

to Sunrise. Upon information and belief, Safahi knew that this fraud was occurring and is the likely perpetrator of the fraud.

40.     Moreover, Safahi made a substantial personal purchase immediately after CardEx shutdown, indicating his access to significant sums of money at the same time he was telling Sunrise that significant sums of money that should have been delivered to Sunrise were non-existent. Real estate records indicate that about one week after Safahi told Sunrise that CardEx was out of money and was shutting down, Safahi closed on a house in California that is likely valued at over $1 million.

41.     Furthermore:

    a.  CardEx is insolvent and was undercapitalized. On September 24, Safahi stated he was shutting down CardEx. In an email on September 25, 2014, Safahi stated that he has a cause of action for forcing CardEx into bankruptcy, and on October 14, 2014, the Court entered a temporary restraining order ordering CardEx to "immediately deliver to Sunrise any and all amounts held in trust for Sunrise"; since then, CardEx has delivered no funds to Sunrise.

    b.  CardEx had nonfunctioning officers. For example, CardEx's purported CFO recently claimed to be a mere "consultant," not a functioning officer of the company.

    c.  Safahi apparently accessed funds that were supposed to have been held in trust by CardEx for his own personal benefit, including, among other

11

things, to close on a house one week after telling Sunrise that CardEx

was out of money.

    d.  CardEx was used to commit fraud on Sunrise and Sponsors.

## COUNT I – BREACH OF CONTRACT
### (Against CardEx)

42.    Sunrise restates and incorporates the preceding allegations as if fully set

forth herein.

43.    Sunrise entered into the Agreement with CardEx.

44.    The Agreement is a valid and legally binding contract.

45.    CardEx materially breached its obligations under the Agreement by, among

other things, providing false reporting to Sunrise, loading prepaid cards with incorrect

and unfunded amounts, by failing to maintain funds received by Sponsors in a statutory

trust for Sunrise, and by failing to immediately forward funds received from Sponsors to

Sunrise.

46.    Sunrise has fully performed its obligations pursuant to the Agreement.

47.    As a consequence of CardEx's material breach of the Agreement, Sunrise

has been damaged in an amount to be proved at trial in excess of $50,000 and is entitled

to interim relief as requested herein.

## COUNT II – BREACH OF CONTRACT
### (Against Alan Safahi - Piercing the Corporate Veil))

48.    Safahi is jointly and severally liable for CardEx's breach of contract.

CardEx's veil should be pierced with respect to its alter ego, Alan Safahi. Safahi operated

CardEx in an unjust and fundamentally unfair way by using it as a façade to defraud

Sunrise and Sponsors to obtain access to a flow of cash that CardEx had promised to hold in trust for cardholders.  Safahi used CardEx to accomplish this fraud by:  (1) promising to immediately transfer to Sunrise all prepaid-card-related funds that it received from Sponsors while simultaneously pocketing a significant portion of the funds that were supposed to be held in trust for cardholders; (2) concealing the fraud by lying to Sunrise about the amount of funds received from Sponsors; and (3) extending the fraud by sending falsified funding reports and Flat Files to Sunrise, which relied on those reports by continuing the CardEx relationship. Upon information and belief, Safahi was personally involved in falsifying funding reports and Flat Files that were sent to CardEx.

### COUNT III – UNJUST ENRICHMENT
**(Against CardEx and Safahi)**

49.    Sunrise restates and incorporates the preceding allegations as if fully set forth herein.

50.   CardEx and Safahi collected funds from Sponsors that should have been transferred to Sunrise and held in trust for the benefit of cardholders.

51.   CardEx and Safahi failed to deliver these funds to Sunrise.

52.   To the extent that Sunrise's breach of contract claim rests upon CardEx's actions after termination of the Agreement or if the Agreement is found to be invalid, Sunrise seeks equitable relief in the alternative to its breach of contract claim.

53.   Specifically, CardEx and Safahi have substantially benefitted from failing to deliver to Sunrise the funds that they represented to Sponsors were loaded onto cards.

13

54.   It would be contrary to equity and good conscience for CardEx and Safahi to retain the benefits that have come to them at the expense of Sunrise's reputation and resources.

55.   CardEx and Safahi would be unjustly enriched at Sunrise's expense if they do not deliver to Sunrise an amount to be proved at trial in excess of $50,000. Sunrise is otherwise entitled to interim relief as requested herein.

### COUNT IV – CONVERSION
### (Against CardEx and Safahi)

56.   Sunrise restates and incorporates the preceding allegations as if fully set forth herein.

57.   The Agreement obligated CardEx to hold in trust for Sunrise and for the benefit of cardholders all funds collected from Sponsors but not transferred to Sunrise. The Agreement further provided that such funds would never be deemed an asset or property of CardEx.

58.   CardEx and Safahi violated this trust obligation by retaining funds collected from Sponsors.

59.   CardEx and Safahi are intentionally and unlawfully retaining possession of the funds.

60.   As a consequence of CardEx and Safahi's unlawful possession of the funds, Sunrise has been damaged in amount to be proved at trial in excess of $50,000 and is entitled to interim relief as requested herein.

## COUNT V – FRAUDULENT MISREPRESENTATION
### (CardEx and Safahi)

61.    Sunrise restates and incorporates the preceding allegations as if fully set forth herein.

62.    Through Web sites and an IVR System that CardEx maintains or has maintained, CardEx and Safahi have made material representations to cardholders about the funds available in their accounts and their ability to redeem unfunded rewards redemptions.

63.    Defendants' misrepresentations concerning the funds available in cardholders' accounts and cardholders' ability to redeem unfunded rewards redemptions were materially false.

64.    Defendants also made false statements in Safahi's mass email to cardholders on September 25, 2014. False statements in that email include: "[Sunrise's] legal steadfastly refuses to accept responsibility for their own cardholders."

65.    Defendants intended the cardholders to rely on these misrepresentations.

66.    Defendants are subject to liability to Sunrise for these misrepresentations because they intended for the cardholders to repeat the terms of the misrepresentations or communicate their substance to Sunrise to influence Sunrise's conduct.

67.    Further, Defendants made material misrepresentations by falsifying funding reports and Flat Files that they sent to Sunrise. Upon information and belief, Safahi was personally involved in falsifying those records.

68.    Defendants intended Sunrise to rely on these misrepresentations.

69.    Sunrise relied on these misrepresentations by continuing its relationship with CardEx and Safahi.

70.    Defendants' misrepresentations damaged Sunrise in amount to be proved at trial in excess of $50,000 and Sunrise is otherwise entitled to interim relief as requested herein.

## COUNT VI – DEFAMATION
### (CardEx and Safahi)

71.    Sunrise restates and incorporates the preceding allegations as if fully set forth herein.

72.    Defendants have made and continue to make false and defamatory statements of fact concerning Sunrise aimed at Sunrise's credit, reputation, and business, including but not limited to misrepresentations concerning (1) the availability of funds on cards that Sunrise properly terminated; (2) the ability of cardholders to redeem unfunded reward redemptions; (3) Sunrise's possession of funds CardEx never provided to Sunrise.

73.    Defendants further defamed Sunrise when it sent a mass email to cardholders on September 25, 2014. Though they had been systematically stealing or otherwise converting funds that they had promised to hold in trust for cardholders, Defendants claimed that they were acting in the best interest of the cardholders. Defendants implied Sunrise had the funds and was refusing to pay cardholders. Defendants claimed that Sunrise "steadfastly refuses to accept responsibility for their own cardholders." That statement was false.

74.    Defendants communicated these defamatory statements of fact to

cardholders and Sponsors.

75.     Defendants' defamatory statements directly tended to affect the credit, property, business, and reputation of Sunrise in the business community.

76.     Defendants' defamatory statements have damaged Sunrise in an amount to be proved at trial in excess of $50,000 and Sunrise is otherwise entitled to interim relief as requested herein.

## COUNT VII – NEGLIGENCE
### (CardEx and Safahi)

77.     Sunrise restates and incorporates the preceding allegations as if fully set forth herein.

78.     As a processor of card transactions, Defendants owed Sunrise a duty of care to reasonably adhere to the professional standards that apply to a card processor. That duty encompassed the provision of processing services necessary to maintain the prepaid cards and cardholder accounts issued by Sunrise on the MasterCard network, including card fulfillment, card activation, card balance maintenance, transaction authorization and processing, maintenance of processing records, all connectivity required with the MasterCard network, and other similar processor related services.

79.     Defendants breached that duty of care by, among other things, purporting to load funds onto prepaid cards but failing to provide funds to support those loads, allowing cardholders to access automatic systems that provided incorrect card balances even after Sunrise terminated the cards, and indicating to cardholders that CardEx had provided funds to Sunrise that it had not.

80.   Defendants' breaches of the duty of care damaged Sunrise in an amount to be proved at trial in excess of $50,000 and Sunrise is otherwise entitled to interim relief as requested herein.

### COUNT VIII – ACCOUNTING
### (CardEx and Safahi)

81.   CardEx agreed to hold in trust and immediately transfer to Sunrise any money it received from Sponsors to fund the prepaid cards.

82.   CardEx failed to hold at least some money received from Sponsors in trust or transfer it to Sunrise.

83.   CardEx should be required to provide an accounting of all money received from Sponsors, and where that money is today.

84.   CardEx has gone out of business.  As an officer of CardEx, Safahi has a duty to handle the dissolution of CardEx in an appropriate fashion, including the liquidation of assets to pay creditors first before any distributions to shareholders or officers.

85.   Safahi should be made to account for all transfers out of CardEx or that resulted from CardEx's dissolution.

### PRAYER FOR RELIEF

**WHEREFORE,** Sunrise prays that this Court enter judgment in its favor and against CardEx as follows:

1.   Entering a temporary restraining order and preliminary and permanent injunctions preventing CardEx and Safahi from:

a. Making any representations regarding the amount of balances on prepaid cards issued by Sunrise. This includes maintaining, operating, or causing or facilitating in any way the maintenance or operation of Web sites or Interactive Voice Response ("IVR") systems that allow cardholders to check card balances, review transaction histories, or to redeem rewards points under a CardEx rewards for purportedly loading funds to prepaid cards issued by Sunrise;

b. Distributing any prepaid cards issued by Sunrise;

c. Representing that CardEx or Safahi has any authority to collect money on behalf of Sunrise or to fund prepaid cards issued by Sunrise; and

d. Using Sunrise's logo or representing that CardEx is associated with Sunrise in any way.

2. Ordering CardEx and Safahi to return to Sunrise all prepaid cards issued by Sunrise.

3. Ordering CardEx to deliver to Sunrise any and all amounts held in trust.

4. A declaratory judgment that all cash held by CardEx, and all funds received by Safahi from CardEx, shall be held in constructive trust for the benefit of cardholders until a full accounting can be made.

5. Ordering CardEx to account for all funds received from Sponsors.

6. Ordering Safahi to account for all transfers out of CardEx or that resulted from CardEx's dissolution.

7. All damages caused to Sunrise by Defendants.

8. Granting any other relief that the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Dated: November 7, 2014

**FAEGRE BAKER DANIELS LLP**


/s/ Jane E. Maschka
D. Charles Macdonald (#151385)
Charles F. Webber (#215247)
Jane E. Maschka (#0389130)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

**ATTORNEYS FOR PLAINTIFF
SUNRISE BANKS, N.A.**

## ACKNOWLEDGMENT REQUIRED BY
## MINN. STAT. § 549.211, SUBD. 1

The undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, subd. 3, sanctions may be imposed if, after notice and a reasonable opportunity to respond, the Court determines that the undersigned has violated the provisions of Minn. Stat. § 549.211, Subd. 2.

Dated: November 7, 2014          **FAEGRE BAKER DANIELS LLP**

/s/ Jane E. Maschka
D. Charles Macdonald (#151385)
Charles F. Webber (#215247)
Jane E. Maschka (#0389130)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

**ATTORNEYS FOR PLAINTIFF
SUNRISE BANKS, N.A.**

21

## PREPAID CARD PROGRAM AND PROCESSING AGREEMENT

This PREPAID CARD PROGRAM AND PROCESSING AGREEMENT (the "Agreement") dated this <u>21st</u> day of <u>June,</u> 2013 ("Effective Date") is by and between **CARD EXPRESS, INC.**("Company"), a California Corporation, whose principal office is located at 182 Howard Street, #409, San Francisco, CA 94105, and **SUNRISE BANKS, N.A.**, a federally-chartered bank having its principal offices at 200 University Avenue West, St. Paul, Minnesota 55103 ("Bank"). Company and Bank are collectively referred to as the "Parties" and are individually referred to as a "Party."

### RECITALS

(a)     Bank is a member of Visa, MasterCard, Discover and various other card associations and electronic payment networks, and, among other things, issues prepaid cards and establishes settlement accounts for the settlement of card transactions;

(b)     Company is a marketer of prepaid cards through various channels as set forth herein, and desires to market and distribute Cards on behalf of Bank and, Company is engaged in the business of providing certain services related to prepaid card programs, including, without limitation, card activation, transaction authorization, processing, clearing and settlement, reporting, System access and other related services which are necessary to issue a prepaid card and process a transaction in accordance with the System Rules and Applicable Law;

(c)     Bank and Company desire to collaborate in developing, marketing and distributing Cards issued by Bank under the Card Programs contemplated herein;

(d)     Bank desires to (i) retain Company to provide certain marketing and program management services; (ii) have Company market Bank's Programs in accordance with this Agreement; (iii) grant to Company sponsorship into the Network (as defined below) and the privileges that relate to said sponsorship for the purposes of marketing Bank-issued prepaid Cards to Company's customers; and (iv) retain Company to provide certain processing services in connection with Program as further described herein; and

(e)     Company desires to (i) provide its marketing services to Bank; (ii) serve as the Bank's limited agent solely for the purposes of marketing Bank's Programs to Company's customers in accordance herewith; (iii) remit to Bank such Load Amounts as Company receives from any third party clients and sellers; and provide such processing services as described herein.

### TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, the Parties hereto, intending to be legally bound, agree as follows:

1.   CERTAIN DEFINITIONS.

Except as otherwise specifically indicated, the following terms shall have the following meanings in this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)     "Activity Account" means the Bank-owned account maintained by Bank and used for Settlement of all Transactions initiated by use of a Card by or on behalf of a Cardholder.

(b)     "Applicable Law" means any applicable international, federal, state, or local law, and any regulation, rule, supervisory guidance, directive, or interpretation promulgated or published by any Regulatory Authority, any order issued by a court having jurisdiction over a Party, or any applicable rule or requirement of any

Network related to the issuance, sale, authorization or usage of the Cards or services to be provided under this Agreement.

(c)     "Card" means a prepaid card issued and/or sold by Bank to a Cardholder pursuant to this Agreement, used for the purchase of goods and services and/or the withdrawal of funds by accessing the available balance in a Cardholder Account through a Network. Card may include prepaid cards of any type acceptable by a Network as further described in any Card Program Addendum.

(d)     "Card Account Income" means all revenue received from a Cardholder including, but not limited to, interest income, Transaction fees, balance inquiry fees, and other fees as specified in the Cardholder Agreement from time to time.

(e)     "Card Pack" means a retail packet that includes an un-activated Card or a direct mail packet that includes a Card together with the Cardholder Agreement and that is produced by or on behalf of Company for display and use with respect to a Card Program.

(f)     "Cardholder" means (i) a person to whom a Card is issued, or (ii) a person who activates or otherwise uses a Card to originate a Transaction.

(g)     "Cardholder Account" means the individual prepaid account which is associated with a Card, and includes the record of debits and credits with respect to Transactions originated by a Cardholder.

(h)     "Cardholder Agreement" means the agreement between Bank and a Cardholder governing the terms and use of a Card and all related disclosures as may be required by Applicable Law.

(i)     "Float" means the average daily balance of funds in the Activity Account for a given month multiplied by the Federal Funds rate as reported on the last business day of the month.

(j)     "Funding Account" means Bank-owned accounts that are maintained at Bank which are used to hold the Cardholder Loads that have not yet been attributed to the Activity Account for purposes of the daily Settlement of Card Transactions as further described and depicted in the Program Addendum.

(k)     "Graphic Standards" means all standards, policies, and other requirements adopted by a Network or Bank from time to time with respect to use of its Marks.

(l)     "Interchange" or "Interchange Fee" means the fee paid to the issuer of a Card by an acquiring financial institution for a Transaction, as established by a Network.

(m)     "Load" means the loading of funds or value to a Card at the time such Card is activated, or subsequent thereto.

(n)     "Load Amount" means the amount a Cardholder, employer or corporate program sponsor Loads onto a Card.

(o)     "Load Failure" means the inability of any Load to be effectively credited to the Funding Account or Activity Account, for any reason, including but not limited to a Load reject or ACH reject, but excluding a Load failure due to the action or inaction of Bank or the Network.

(p)     "Mark" means the service marks and trademarks of a Network, Bank and Company, including but not limited to, the names and other distinctive marks or logos, which identify a Network and Bank.

(q)     "Marketing Fee" means the fee paid by Bank to Company for the marketing of the Cards as described in EXHIBIT A.

(r)     "Membership" means the membership in a Network and licensing rights thereto obtained by Bank.

(s)     "Network" means MasterCard, VISA, Cirrus, Plus, and/or any other network over which Transactions and Settlements are processed.

(t)     "Processing Services" means those services which are necessary to issue a Card and process a Transaction in accordance with the Rules of any Network and Regulatory Authority. Such services shall include but not be limited to: set-up and maintenance of the Cardholder Account(s), Transaction authorization, processing, clearing and Settlement, Network access, Cardholder dispute resolution, Network compliance, regulatory compliance, security and fraud control, customer service, and activity reporting, all as further set forth in EXHIBIT C.

(u)     "Program" means the marketing, evaluation, issuance, processing, administration, supervision, servicing, and maintenance of the Cards and Cardholder Accounts established under this Agreement, and when used, the phrase "Card Program" shall mean one or more prepaid Card programs established pursuant to a Program Addendum executed by Company and Bank in connection with this Agreement.

(v)     "Program Addendum" means an addendum to this Agreement, executed by Bank and Company, in which Bank authorizes the implementation of a Program and which sets forth the general features of the Program, specific additional responsibilities or obligations of each Party, funding flow, and terms and conditions of a specific Program marketing effort.

(w)     "Program Revenues" means all Card Account Income and Interchange Fee revenues generated by or accruing under a Program.

(x)     "Regulation E" means (i) the regulations, all amendments thereto and official interpretations thereof (12 C.F.R. Part 205) issued by the Board of Governors of the Federal Reserve System implementing Title IX (Electronic Fund Transfer Act) of the Consumer Credit Protection Act as amended (15 U.S.C. 1693 et. seq.), and (ii) the Electronic Fund Transfer Act and any amendments thereto.

(y)     "Regulatory Authority" means, as the context requires, any Network; the Office of the Comptroller of the Currency; the Federal Deposit Insurance Corporation; the Federal Reserve Board; the Consumer Financial Protection Bureau; the Federal Trade Commission; the Financial Crimes Enforcement Network; and any other Federal or state regulator or agency having jurisdiction over Bank or Company.

(z)     "Reseller" means any third party engaged by Company to perform any marketing, distribution or sales functions independently or by or on behalf of Company in connection with any Program under this Agreement.

(aa)    "Rules" means the by-laws and operating rules of any Network, the published regulations of any Regulatory Authority, any Federal or State statutes, and the published policies and procedures of Bank, as promulgated by Bank's Board of Directors in good faith to ensure the continued safety and soundness of Bank.

(bb)    "Settlement" means the movement of funds between Bank and Network members in accordance with the Rules.

(cc)    "Solicitation Material" means the advertisements, brochures, applications, marketing materials, telemarketing scripts and any other verbal or written materials relating to a Program, including point of purchase displays, television advertisements, radio advertisements, electronic web pages, electronic web links, and any other type of advertisement, marketing material, or interactive media related to the Program or any other materials sent to, or viewed by, a Cardholder or prospective Cardholder from time to time.

(dd)   "Transaction" means a Card transaction that is processed through the Network and its members, Bank and Company, including deposits, purchases, cash withdrawals, disputes and refunds.

2.   GENERAL DESCRIPTION OF PROGRAM

2.1   Purpose. The purpose of any Program initiated pursuant to this Agreement is to offer Cards, issued by Bank and marketed by Company, as an alternative to traditional payment mechanisms. Cards may be used by Cardholders to pay for purchases, obtain cash advances or other uses as allowed by law all as further set forth in the applicable Program Addendum.

2.2   Cardholder Approval. Prior to Card activation, and as may be required by Applicable Law, Cardholders shall be approved and qualified for purposes of receiving a Card as specified in the applicable Program Addendum, which may include, but is not limited to, the collection of Cardholder and Cardholder identity verification. Bank reserves the right to deny Cardholder approval in accordance with Applicable Law or Rule, and Company agrees to cooperate with Bank in the Cardholder approval or denial process.

2.3   Cardholder Solicitation and Distribution. Company will market to prospective Cardholders and distribute Cards in accordance with the terms of this Agreement and the Rules, and subject to the terms and conditions of any Program Addendum. Cards may be distributed in custom packaging, which shall include such additional materials as the Parties may determine including, but not limited to, a Cardholder Agreement describing the Program and Card use.

2.4   Card Activation. Cards for approved Cardholders may be activated by a Cardholder by calling an Interactive Voice Response Unit, accessing an approved Internet application, or as otherwise described in the applicable Program Addendum.

2.5   Establishment of Activity Account. Bank shall set up and maintain a Bank owned and Bank controlled Activity Account, or such other accounts as it may deem appropriate under the applicable Program Addendum, for purposes of applying Cardholder value Loads and the payment of Settlement Transactions to the Network.

2.6   Card Value Loads and Delivery of Cardholder Payments. All mechanisms for Card Loading will be as set forth in this Agreement or the applicable Program Addendum. No Loading mechanism may be utilized unless approved by Bank in writing. All payments collected from Cardholders, employers or corporate program sponsors shall be collected by Bank. To the extent Company receives such sums, Company or Company's agent shall forward the same to Bank immediately via wire, ACH transfer or as otherwise specified in the applicable Program Addendum.

2.7   Program Modification. In the event that Bank and/or Company determines that Applicable Law or the Rules requires a modification to any Card Program contemplated by this Agreement, including, without limitation, a determination that Applicable Laws or Rules have been modified or passed in a jurisdiction that prohibit or place restrictions on the sale or distribution of Cards in the manner agreed, then the determining Party shall provide the other Party with written notice of such determination, and each Party shall cause itself and its agents, vendors, and/or third party service providers to take reasonable steps to avoid violating such Applicable Law or Rule, which the Parties acknowledge and agree may require suspending or terminating sales of the Cards in certain jurisdictions, and the actual out-of-pocket costs of taking such reasonable steps shall be borne solely by Company.

2.8   Program Preservation. Unless otherwise prohibited by Applicable Law or Rule, in the event of any Program modifications contemplated by Section 2.7 or otherwise, the Parties agree to use commercially reasonable efforts to exhaust any inventory of current Cards, Cardholder Agreements, and Solicitation Materials as applicable.

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

2.9    Holder of Funds. Unless otherwise agreed or operationally determined between the Parties, Bank shall be the holder of funds for purposes of any state unclaimed property laws.

2.1    Prepaid Access.

a. Upon execution of this Agreement, Company shall either (i) register as the provider of prepaid access with the Financial Crimes Enforcement Network ("FinCEN") in connection with the Program or (ii) request an administrative ruling from FinCEN pursuant to 31 CFR 1010.710 et seq. finding that Company need not register as a provider of prepaid access for the Program.

b. Company shall provide Bank with copies of any licenses or registrations Company maintains in connection with its business activities (both in connection with the Program and any other business), including any money service business registrations or money transmitter licenses, as well as any renewals or modifications thereto.

3.    DUTIES OF COMPANY

3.1    Marketing. Company shall, from time to time, promote and market Cards to prospective customers, subject to Applicable Law, all Rules, and in accordance with this Agreement and any Program Addendum.

(a)    Except as may be agreed by the Parties from time to time during the term of this Agreement, Company shall be responsible for its own costs and expenses associated with the marketing of any Card or Program under this Agreement and shall further be responsible to ensure that all Solicitation Material, the Cardholder Agreement, marketing methods, and marketing-related activities are in compliance with Applicable Law.

(b)    Bank shall use its commercially reasonable best efforts to assure Company obtains all required Network approvals, as Bank or such Network may require. Company shall be responsible for costs related to such approval as outlined in EXHIBIT A to this Agreement, including, but not limited to, any costs relating to any Independent Sales Organization ("ISO") involved in the Program. It is expressly understood that approval by any Network is a condition precedent to the commencement of any Card Program and the execution of a Program Addendum.

(c)    Bank grants to Company a nonexclusive, royalty free, nontransferable right and license to use certain Marks (owned by Bank or its licensors). The use of the Marks by Company without the prior written consent of the Bank is prohibited.

(d)    Company will submit all proposed Solicitation Material and any proposed changes to any Cardholder Agreements relating to a Card or Program to the Bank for review and written approval prior to its release or use in the marketplace. Bank shall not intentionally delay or unreasonably withhold its review and approval of proposed Solicitation Material and Cardholder Agreement. It is expressly understood that Bank's review and approval shall be for Bank's own independent purposes, and the same shall not constitute a certification to Company of any kind. Bank's approval shall not relieve Company of its independent or exclusive obligation to ensure that the Solicitation Material and Cardholder Agreement comply with Applicable Law. It is further understood that Bank shall have the right to withdraw approval of any previously approved Solicitation Material in the event of a change in Applicable Law or Rules, or upon direction or criticism of any Regulatory Authority.

(e)    Company acknowledges that Bank reserves the right to refuse to approve any proposed Card Program involving, in any way, illegal products or services, Cardholders, sub-marketers, or affiliated parties that my pose undue reputational risk to Bank, or Card Programs involving sexually oriented or pornographic materials.

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

    3.2    <u>Program Development and Implementation</u>. Company will develop Card marketing efforts for the marketing and distribution of Cards in various markets, subject to terms and conditions as set forth in a Program Addendum (substantially in the form of E<small>XHIBIT</small> B) and any related attachments, and such other documents as Bank may reasonably require in connection with any Program. Bank reserves the right, in its sole discretion, to refuse approval of any Card marketing proposal that, in its opinion, presents excessive financial or reputational risk, is deemed by Bank to be non-viable or not in keeping with any Rule, or may be deemed to be in violation of Applicable Law. Company acknowledges and agrees that Bank may condition its execution of any Program Addendum for a new Card marketing effort on amendments to the fees set forth in E<small>XHIBIT</small> A.

    3.3    <u>Cards and Cardholder Agreements</u>.

    (a)    Company shall be responsible for the manufacturing and printing of all Cards and the applicable Cardholder Agreement (including the costs thereof) as approved by Bank from time to time, though Company may contract with a third party approved by the Bank to provide such services for Company. All such Cards and Cardholder Agreements shall identify Bank (or its designee) as the issuer of the Cards and shall include such other names and Marks as may be required to conform to Graphic Standards, Regulatory Authority and Rules. Any design for a co-branded Card and Cardholder Agreement shall be subject to Bank's prior approval, which shall not be unreasonably withheld or delayed.

    (b)    In the event that the Card and/or Cardholder Agreement do not comply with any Applicable Law at any time after delivery thereof to a Cardholder, Company shall use commercially reasonable efforts to deliver to such Cardholder an amended Cardholder Agreement that complies with Applicable Law.

    (c)    Bank shall have the right, in its sole discretion, from time to time upon sixty (60) days' prior written notice to Company (or such shorter notice period as Company may agree, or with no advance notice in the event of a change that is required in order to comply with Applicable Law), to change, alter or amend the Card or Cardholder Agreement, all in accordance with Applicable Law and the provisions of Section 2.8. The cost of any changes to the Cardholder Agreement for any reason, including any changes necessitated by Company's actions or requests (other than discretionary changes imposed by Bank not otherwise required by Applicable Law) shall be borne by Company.

    3.4    <u>Distribution of Cards</u>. Company shall be responsible for the distribution of Cards (or Card Pack), as further described in any Program Addendum. Company shall ensure that any and all Cards are handled, shipped and distributed in accordance with any and all Rules, including the Network Rules provided to Company upon execution of this Agreement, and as the same may be amended and provided to Company annually thereafter in association with Company's ISO registration renewal. In accordance with the Rules, Company agrees that it shall implement inventory management controls for any and all Cards that are maintained in its possession and cause, through contractual agreement, any third party in possession of such Cards to implement inventory management controls which comply with the Rules as may be communicated by Bank to Company from time to time. Company agrees that it will send monthly inventory reports to the Bank. Monthly inventory reports shall include, at a minimum, the following data: prior month's beginning on hand inventory, new inventory received, month's usage (new issues and reissues), miscellaneous usage (damaged, physical adjustments, etc.), and prior month's ending inventory.

    3.5    <u>Termination of Cards</u>. Company acknowledges that Cards are the property of Bank, and shall be subject to cancellation at any time by Bank, in accordance with this Agreement, the Cardholder Agreement or as required by Applicable Law, or, on a case-by-case basis, where the Bank believes a Cardholder is using the Card for fraudulent or illegal purposes. Upon receipt of such notice from Bank or upon Termination of this Agreement for any reason, Company shall, at its sole expense (i) immediately disable and return such cancelled Cards in its possession or under its control to Bank, and (ii) notify any other party or agent of Company, including any third party service providers, to disable and return all such cancelled Cards in their possession to Bank, or (iii) provide written certification of destruction of any unused Cards, under dual control, by a third party approved by the Bank

all in keeping with the Rules as set forth by the applicable Network as it pertains to the shipping and destruction of Cards.

3.6     Distribution of Cardholder Agreements. Company shall be responsible for the distribution of Cardholder Agreements (or Card Packs), as further described in any Program Addendum. In the event that Bank, in its sole discretion, determines that the Cardholder Agreement does not comply with any Applicable Law, Company shall immediately cease delivery of such Cardholder Agreements as directed by Bank. The Parties shall reasonably cooperate with one another to promptly include any amended Cardholder Agreements in the Card Packs or replace such Card Packs with Card Packs that include such amended Cardholder Agreements. All costs and expenses associated herewith shall be borne solely by Company.

3.7     Customer Service. Company shall be responsible for such customer service standards as may be set forth in the applicable Program Addendum. Company may not engage a third party service provider in connection with the performance of customer service activities without Bank's prior written approval. Company specifically acknowledges and agrees that the customer service provided to Cardholders in connection with the Program, whether provided by Company or through a third party processor or servicer, shall be subject to a service level agreement requiring the performance of the servicing in accordance with those specific standards as set forth in the Program Addendum and such other commercially reasonable industry standards and shall provide for appropriate monitoring, monthly reporting, and penalties for performance outside of parameters specified by Bank. With respect to any Cards that are subject to Regulation E, Company agrees that in the event it or any third party processor or servicer receives any oral or written notice of "error" as defined by 12 CFR 205.11(a) of Regulation E, Company will respond to such errors in accordance with the terms of the Cardholder Agreement, or Regulation E, as applicable. Company shall retain all error-related information and shall provide the same to Bank as it may reasonably request from time to time. To the extent Bank responds to any such errors, Company shall use reasonable efforts to cooperate with Bank in the reasonable resolution of any customer or Cardholder-reported error, all in accordance with Applicable Law.

3.8     Establishment of Funding Account. As Bank may direct, Company shall establish and maintain a Funding Account at Bank for purposes of receiving funds from Card issuance and Cardholder Loads from sales or Loads attributable to Company marketing performed directly or through any agent of Company. Company shall ensure at all times adequate funds are available to fund all Loads to the Cardholder Accounts.

3.9     Payment Load Mechanisms and Locations. Any Load mechanism or location with respect to any Card Program shall be as set forth in the Program Addendum or as may otherwise be approved by Bank in writing. No Load mechanisms, including Load locations, Networks or other features may be used in connection with any Program unless pre-approved by Bank. Company shall be responsible for ensuring that any Load mechanism or Load location, including the involvement of third parties in connection with the same, are in compliance with Applicable Law.

3.10     Liability for Load Problems. Company shall be responsible for all Load Failures, without regard to causation except those caused by the Bank or the Networks. In the event of a Load Failure in connection with any Card Program, not caused by the Bank or the Network, Company shall, within one (1) business day after receiving notice of such Load Failure, fully fund any shortfall in the Funding Account. To the extent not covered by any reserve account, a monetary assessment of 2% times the amount of the Load Failure shall be assessed each calendar day that any Load Failure is outstanding after the date of funding.

3.11     Transfer of Load Amounts and Payments. For all Programs (other than gift card Programs) Company shall be responsible for the collection and transfer of Load Amounts to the Bank, all as further described on the applicable Program Addendum. It is expressly understood that any Load Amounts coming into the possession of Company or any agent or service provider of Company shall be deemed to be held in trust for the Bank (i.e. statutory trust) and for the benefit of the applicable Cardholder, and no part of such Load Amounts shall be deemed the property of, or an asset of, Company.

  3.12 <u>Processing Services</u>. Unless otherwise provided in any Program Addendum, Company shall provide the Processing Services as described in EXHIBIT C in connection with the Program. The Processing Services shall be provided in accordance with the Service Level Agreement and standards outlined in EXHIBIT D. Company shall ensure that Bank has electronic, real-time online access to records to Client's system relating to the processing and servicing of the Cards issued by Bank. Such access shall allow Bank to identify and review Cardholder Accounts. Should further action be required, CardEx agrees to immediately suspend, close, or otherwise limit the use of such Cardholder Accounts at Bank's request.

  3.13 <u>Cardholder Fraud and Fraud Recovery</u>. Company agrees that it shall be responsible for and liable to Bank for all expenses associated with, and any losses from, over limit processing, Cardholder or value Load fraud, under floor limit processing, or Bank's efforts at fraud or unauthorized Transaction recovery under Applicable Law. Company shall cooperate fully with Bank in its efforts and engage in any commercially reasonable efforts to locate and prosecute the perpetrator of any such unauthorized activity or fraud.

  3.14 <u>Establishment of Negative Balance Reserve Account</u>. For purposes of retaining adequate reserves to off-set any outstanding balances and fraud losses as described in Section 3.14, Bank shall set up and maintain for each Program, as applicable, a Bank-owned and Bank-controlled reserve account known as the "Negative Balance Reserve Account" in an amount commensurate with the absolute value of the sum of any actual negative balances on Cardholder Accounts as of the last day of the previous calendar month. Negative balances shall include, but not be limited to, negative Cardholder Account balances resulting from Transactions involving over limit processing, Cardholder or value load fraud, under floor limit processing, and unauthorized Transactions. Card Account Income will be disbursed as described in Exhibit A, net of any outstanding negative balance accounts and, in the event Card Account Income is insufficient to fund the required negative balances, Company shall pay Bank the difference. Any negative balance reserves maintained by Bank will be net of unposted chargeback funds on deposit in the applicable Program accounts. Company shall ensure that the Negative Balance Reserve Account has a minimum balance of not less than $5,000.00 at all times.

  3.15 <u>Cardholder Refunds</u>. Company shall be responsible for the amount of any refunds paid to a Cardholder (beyond any actual remaining balances in the Cardholder Account) necessitated by any Cardholder complaint or otherwise, including but not limited to, any retail Card fees or other Card Account Income.

  3.16 <u>Bank Secrecy Act Compliance</u>. Company shall cooperate with Bank in the implementation of Bank's Bank Secrecy Act ("BSA"), anti-money laundering ("AML"), and Office of Foreign Assets Control ("OFAC") compliance program, including the implementation of policies and procedures to effectuate the requirements set forth in Bank's "Anti-Money Laundering Requirements for Prepaid Partners" as provided to Company and amended from time to time (the "BSA/AML Policy"). In accordance therewith, and as may be required by Applicable Law, Company shall:

 (a) Develop policies and procedures to implement Bank's BSA/AML Policy requirements, including, but not limited to policies and procedures that provide for:

  (i) Designation of a qualified individual responsible for managing BSA/AML compliance for Company. Company shall immediately notify Bank of any change in Company's designated BSA/AML compliance officer.

  (ii) Annual BSA/AML training for all Company employees involved in marketing, promoting, or implementing a Card Program, including senior management. Company's designated BSA/AML compliance officer shall be required to attend BSA/AML training on an on-going basis, and Company shall provide documentation of such training to Bank annually.

  (iii) Verification of the identity of all Cardholders and prospective Cardholders consistent with the Rules and Bank's BSA/AML Policy. For each Card Program, Bank shall set forth Company's obligations with regard to identity verification in the applicable Program Addendum, including parameters for

whether verification may occur through non-documentary methods, documentary methods or both, and whether Company may retain a Bank-approved vendor to provide Cardholder identity verification services. All Company identity verification procedures must be approved by Bank prior to the issuance of any Cards under a Card Program. In the event Bank approves the involvement of a third party in connection with identity verification for a Card Program, Company shall regularly audit the records of such third party and, additionally, secure Bank's right to audit such third party's books and records related to identity verification upon reasonable notice not to exceed ten (10) days.

(b) Procure, at its own expense, an independent test and audit of its AML program. The scope of such audit shall be approved by Bank and shall include all processes and procedures related to Company's AML program and a comparison of said procedures to Bank's BSA/AML Policy. The audit shall be conducted by an auditor approved by Bank on at least an annual basis, or more frequently as required by Bank. Company shall promptly provide the results of such audit to Bank. In the event the independent testing reveals deficiencies, Company shall promptly remedy the same. Company shall keep Bank advised as to its progress in remedying the deficiencies and shall permit Bank to independently verify that appropriate remedies have been implemented.

(c) Comply with all Applicable Law and Bank's BSA/AML Policy relating to OFAC regulations, including, but not limited to, (i) appropriate screening of all Cardholders prior to Card issuance and periodically thereafter at intervals as required by Applicable Law and the BSA/AML Policy, including OFAC regulations, (ii) complying with all OFAC directives and updates thereto, regarding screening criteria and the prohibitions on trade and financial transactions with defined countries, entities, and individuals, (iii) determining whether an initial OFAC hit is a valid match or a false hit, and (iv) reporting of blocked and prohibited transactions.

(d) Monitor the usage of the Cards under the Program, including both Cardholder level and portfolio-wide monitoring, in order to collect data and report on any suspicious activity, including the fraudulent use of the Cards, foreign Card activity, bulk purchases made by one individual, multiple purchases by related parties, unusual activity patterns (including cash Loads followed by immediate withdrawals in another location), and other data as specified in the BSA/AML Policy. Company shall provide such reports as may be necessary in accordance with Applicable Law for Bank to timely prepare any required Suspicious Activity Reports and to allow Company and Bank to promptly terminate the use of any Card suspected of fraudulent activity.

3.17     Program and Compliance Training. Company shall permit Bank to train, or shall otherwise be responsible to provide such Program training to those employees of Company who are involved in the marketing, promotion, or implementation of the Card Program, as further set forth in any Program Addendum. Unless otherwise agreed, the costs of such training shall be borne by Company.

3.18 Recordkeeping; Reporting; and Audit Rights.

(a)     Unless otherwise agreed, for each applicable Card Program and to the extent such records are maintained or in its possession, Company will keep complete records reflecting (i) the identity of each Cardholder and the steps taken to verify such identity if verification is required under Applicable Law and/or the Program Addendum; (ii) an inventory of each Card sold and/or activated by such Cardholder and all Loads on such Cards, (iii) the remaining value on each Card, and (iv) all charges, Transactions and fees that have been made or charged to each Card or Cardholder, and other information as may be required by Applicable Law or Bank, from time to time ("Required Records"). With respect to each Card, Company shall retain all Required Records for the time period required by Applicable Law, and in any event, for no less than five (5) years after the termination of any Cardholder Agreement or Card Program, whichever is later.

(b)     Company shall, within a reasonable time after Bank's request, and to the extent it has such information in its possession or under its control (directly or through a third party), provide Bank with the

following reports with respect to any Card Program: (i) reports detailing the number and nature of complaints and customer service calls that Company receives in connection with any Card on a monthly basis; (ii) detailed reports of any unusual, unauthorized or suspicious activity or Transactions involving the Cards, on a monthly basis; (iii) the number of new Cards sold or issued, summarized on a weekly basis; (iv) the average account balance per Card, average number of re-Loads per active Card on a monthly basis; and (v) a summary report reflecting the sale, activation, purchase and any withdrawal Transactions initiated through Cards associated with the Program.

(c)    Bank reserves the right, at its own expense (except as set forth herein below), to inspect, copy and audit any records of Company directly relating to its performance hereunder. Any such audit will be conducted at mutually agreed upon times, upon reasonable prior written notice (no less than twenty (20) business days), and in a manner designed to minimize any disruption of Company's normal business activities; provided, however, that in agreeing to times for the audit, the Company shall be reasonable in scheduling, and shall not delay any audit for more than forty (40) business days from the date first proposed by Bank. The Parties agree that the audit rights hereunder will be exercised during normal business hours and no more than once in any twelve (12) month period unless reasonably requested by Bank due to an increase in Cardholder complaints, inquiries from any Regulatory Authority or demonstrable compliance concerns..

### 3.19 Card Marketing Locations; Resellers.

(a)    Cards may be marketed directly by Bank, by Company, or through Resellers approved in writing by Bank. Company shall not engage any Reseller without prior written Bank approval. Company shall remain solely responsible for the conduct of all Bank-approved Resellers and shall ensure that such Resellers adhere to all Bank requirements and Applicable Law in connection with the Program.

(b)    Company shall maintain a complete and accurate list of all Bank-approved locations wherein the Cards will be marketed under this Agreement. Upon Bank's request, Company shall provide a list of all Card marketing locations to Bank. Company shall further maintain full and complete files including all Company's due diligence activities and contracts with any Reseller or such other third parties in connection with the marketing of the Cards and shall disclose such due diligence information and unredacted copies of any contracts relating to the same to Bank upon Bank's request.

### 3.20 Delayed Load Funding Reserve Account.

(a)    Company shall establish and fund a separate reserve account (the "Funding Reserve Account") at Bank to secure Bank against the risk that the Card Loads are not ultimately delivered to Bank for deposit into the Funding Account. The Funding Reserve Account shall be under the sole control of Bank and shall be available to Bank for offset to cover any unfunded Card Loads or other obligations owed by Company to Bank.

(b)    For the first year following the Effective Date, the Funding Reserve Account shall have a balance equal to the greater of i) $25,000.00 and ii) the average daily total  gross Settlement obligation (comprised of the sum of all debits to the Cardholder Accounts) owed by Bank to the Networks in connection with the Program during the prior twelve (12) months (based on historical Processor reports) multiplied by three (3). Following the first year from the Effective Date, the Funding Reserve Account shall have a balance equal to the greater of i) $25,000.00 and ii) the average daily  gross Settlement obligation (comprised of the sum of all debits to the Cardholder Accounts) owed by Bank to the Networks in connection with the Program during the prior month multiplied by three (3).

(c)    The required balance in the Funding Reserve Account shall be calculated by Bank on a monthly basis and set forth in Bank's monthly statement to Company. Any adjustments to the required balance in the Funding Reserve Account shall be made on a quarterly basis. However, Bank may request an increase in the Funding Reserve Account in advance of the end of the quarter if the calculations demonstrate a balance deficiency of ten percent (10%) or greater in any given month. Any deficiencies in the balance shall be cured by Company

within seven (7) business days of notice from Bank and Bank shall refund any excess balance (or provide a credit on the monthly statement) within three (3) business days of delivery of the last statement of the quarter.

4.   REPRESENTATIONS AND WARRANTIES OF COMPANY

   4.1   Representations and Warranties. Company represents and warrants to Bank as follows:

   (a)   This Agreement is valid, binding and enforceable against Company in accordance with its terms, except as such enforceability may be limited by laws governing creditors' rights and general principles of equity.

   (b)   Company is a California Corporation duly formed, validly existing and in good standing under the laws of the State of California and is duly qualified and is properly licensed to do business in each jurisdiction in which the nature of Company's activities makes such authorization or licensure necessary. Neither the execution of this Agreement nor Company's performance of its obligations hereunder requires any consent, authorization, approval, notice to, license, or other action by or in respect of, or filing with, any third party or any Regulatory Authority.

   (c)   Company has the full power and authority to execute and deliver this Agreement and to perform all its obligations under this Agreement. The provisions of this Agreement and the performance by Company of its obligations under this Agreement are not in conflict with Company's documents of formation or operation, or any other agreement, contract, lease or obligation to which Company is a party or by which it is bound.

   (d)   Neither Company nor any principal of Company has been subject to the following:

   (i)   Criminal conviction (except minor traffic offenses and other petty offenses) in the United States of America or in any foreign country;

   (ii)   Federal or state tax lien, or any foreign tax lien;

   (iii)   Administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade Commission, federal or state bank regulator, or any other state or federal regulatory agency in the United States or in any other country; or

   (iv)   Restraining order, decree, injunction, or judgment in any proceeding or lawsuit, alleging fraud or deceptive practice on the part of Company.

   (e)   There is not pending or threatened against Company any litigation or proceeding, judicial, tax or administrative, the outcome of which might materially adversely affect the continuing operations of Company.

   (f)   Company has delivered to Bank complete and correct copies of the balance sheets and related statements of income and cash flow of Company  subject to any limitation stated therein, which have been or which hereafter will be furnished to Bank to induce it to enter into this Agreement, and which do, or in the case of materials provided in the future, will, fairly represent the financial condition of the Company. All other information, reports and other papers furnished to Bank will be, at the time the same are furnished, accurate and complete in all material respects and complete insofar as completeness may be necessary to give Bank a true and accurate knowledge of the subject matter. The financial statements are in accordance with the books and records of Company or/and were prepared in accordance with generally accepted accounting principles ("GAAP") as in effect in the United States, as consistently applied, and in accordance with all pronouncements of the Financial Accounting Standards Board.

5.   COVENANTS OF COMPANY

5.1    <u>Covenants</u>. Company covenants and agrees with Bank as follows:

(a)    Company will at all times continue to perform its obligations under this Agreement and will remain in compliance with all Applicable Laws, the Rules, and any rules, orders and regulations issued by the Regulatory Authorities that relate to the matters and Transactions contemplated by this Agreement. Company will be responsible for all fines and penalties assessed by any Regulatory Authority or Network due to Company's actions, inactions or omissions. Without limiting the generality of the foregoing and other terms and conditions herein, Company's obligations under this Agreement, including without limitation, its responsibility for legal compliance, shall in no way be affected, altered and/or waived in the event Bank performs, exercises or fails to exercise, any right, obligation, option, or otherwise, to provide instruction, guidance, or recommendations of any kind, and/or review, any aspect of the Program.

(b)    Company will comply with all Network Rules as may be provided by Bank from time to time. Company has received an electronic copy of the applicable Network Rules, as may be amended by the Network.

(c)    Company will obtain or will at all times maintain appropriate licenses with respect to any trademarks, copyrights and patents affecting any and all aspects of this Agreement.

(d)    Company shall ensure that any Solicitation Material, marketing methods, or other aspects of the Program will not violate any intellectual property rights of any third party.

(e)    Company will promptly give written notice to Bank of any material adverse change in the business, properties, assets, operations or condition, financial or otherwise, of Company and any pending, or a threat of litigation involving a sum of $50,000 or more and of all tax deficiencies and other proceedings before governmental bodies or officials affecting Company.

(f)    As soon as possible, and in any event within ninety (90) days after the end of Company's fiscal year, commencing with the fiscal year ending <u>December 31, 2013</u>, Company will provide Bank with the audited balance sheets and related statements of income and cash flow of itself and all notes and schedules thereto as of the end of such period. Company agrees to provide Bank with unaudited balance sheets and related statements of income and related statements of income and cash flow of Company, and all notes and schedules thereto, on a more frequent and periodic basis as Bank may require.

(g)    Company will timely investigate and resolve all Cardholder reports of "errors" (as defined by 12 CFR 205.11(a) of Regulation E) and will maintain records of the same, including the name and address of the complaining Cardholder, a brief summary of the Cardholder's complaint, and the date upon which such complaint was received, and a summary of any action taken. Company will further respond to all Cardholder inquiries and complaints, and will promptly resolve the same. All material consumer complaints received by Company, relating to the Card or its use, will be immediately reported to Bank.

(h)    In the event Company or any Reseller or third party servicer involved in the Program receives notice of a complaint regarding the Program from any third party, including any state or federal regulator, consumer protection or advocacy agency, or other similar party, Company shall forward such complaint to Bank for review, investigation, and resolution. Company shall cooperate with Bank in connection with Bank's response to said party and, if requested by Bank, will correspond directly with said third party concerning the resolution of the complaint.

(i)    Company will not, without Bank's prior written consent, alter or amend any Solicitation Material, marketing methods, or the terms of any Card Program or Cardholder Agreement.

(j)    Company will not, without Bank's prior written consent, enter into any written agreement with any third party to market, solicit or service Cardholders or prospective Cardholders in connection with any Program.

EXHIBIT A

(k)     At all times, Company's operations relating to its obligations under this Agreement shall be compliant with the Payment Card Industry Data Security Standards ("PCI-DSS") as interpreted and applied by Bank in its sole discretion, including the appropriate level within the PCI-DSS covering Company's operations.

(l)     Company will comply with and perform its obligations under any ancillary agreement or agreements with Bank or any third party provider, including but not limited to any customer service provider, which is now or in the future will be executed in connection with any Program offered pursuant hereto.

(m)    Company will not, without Bank's prior written consent, outsource or otherwise subcontract with third parties for the provision of any of its Duties under this Agreement. "Duties" means the obligations Company has agreed to undertake as more fully set forth in this Agreement. Bank shall have the right to conduct due diligence on all proposed subcontractors or other third party service providers at its sole discretion prior to granting such written approval. Bank's review and approval shall not be unreasonably withheld or delayed. However, any such consent of assignment of Duties shall not release Company of its obligations to Bank under this Agreement, and Company shall remain fully liable to Bank for any breach of this Agreement caused by a subcontractor or third party retained by Company.

(n)     Company agrees that any Regulatory Authority with supervisory authority over Bank (an "Auditing Party") shall have the right to inspect, audit, and examine all of Company's facilities, records and personnel relating to the Program at any time during normal business hours upon reasonable notice. The Auditing Party shall have the right to make abstracts from Company's books, accounts, data, reports, papers, and computer records directly pertaining to the subject matter of the Agreement, and Company shall make all such facilities, records, personnel, books, accounts, data, reports, papers, and computer records available to the Auditing Party for the purpose of conducting such inspections and audits. Such audit, inspection or examination shall be at Company's sole expense, during regular business hours of Company, on reasonable notice, and conducted in a manner as to not interfere with Company's normal business operations.

(o)     Company will cooperate with Bank in implementing commercially reasonable measures designed to meet the objectives of the security and confidentiality guidelines of the Federal Trade Commission and the federal banking agencies' *Interagency Guidelines Establishing Standards for Safeguarding Consumer Information* and the *Interagency Guidelines Establishing Information Security Standards*, including, but not limited to, the implementation of appropriate policies, procedures, and other measures designed to protect against unauthorized access to or use of customer information maintained by Company that could result in substantial harm or inconvenience to any Cardholder and the proper disposal of Cardholder information. Company shall further cooperate with Bank in implementing a response program in accordance with the *Interagency Guidance on Response Programs for Unauthorized Access to Customer Information and Customer Notice* which shall require Company to take commercially reasonable actions to address incidents of unauthorized access to Cardholder or other information, including notification to Bank and Cardholders as soon as possible following any such incident. Company shall ensure that any third party service provider having access to customer information relating to Cardholders be obligated to cooperate in the implementation of similar security measures and response programs as may be directed by Bank.

(p)     Company shall, while this Agreement is in effect, prepare and maintain disaster recovery, business resumption, and contingency plans appropriate for the nature and scope of the Program, the activities of Company, and the obligations to be performed by Company hereunder. The plans shall be sufficient to enable Company to promptly resume the performance of its obligations hereunder in the event of a natural disaster, destruction of Company's facilities or operations, utility or communication failures, or similar interruption in the operations of Company or the operations of a third party which in turn materially affect the operations of Company. The plans shall include: (i) the location of a recovery site or sites for each location at which Processing Services are provided and/or Cardholder data is stored, (ii) address business continuation, disaster recovery, and crisis management issues, (iii) be designed to recover business operations as soon as reasonably practical under the circumstances after a declared disaster, (iv) provide for ongoing testing of such plan, and (v) be regularly updated to the extent necessary to correct deficiencies therewith or to remain consistent with Applicable Law or

Network Rules. Company shall make available to Bank copies of all such disaster recovery, business resumption, and contingency plans and shall make available to Bank copies of any changes thereto. Company shall periodically (but no less than annually) test such disaster recovery, business resumption, and contingency plans as may be appropriate and prudent in light of the nature and scope of the activities and operations of Company and its obligations hereunder and shall involve Bank in such tests and promptly provide Bank with results of thereof.

(q)     Company shall reasonably cooperate with Bank in the implementation of Bank's Identity Theft Prevention Program ("ITPP") designed to detect, prevent, and mitigate identity theft in connection with the Program. The ITPP shall be designed to comply with the provisions of Applicable Law and the *Interagency Guidelines on Identity Theft Detection, Prevention, and Mitigation* set forth at Appendix J to 12 CFR Part 41. To the extent Company is independently obligated to maintain an ITPP, Company shall submit its ITPP to Bank for review.

(r)     Company shall obtain Bank's prior written review and approval of any financial product marketed to Cardholders if the new financial product utilizes Bank's Marks or provides a mechanism for Cardholders to Load funds to the Cardholder Accounts.

(s)     Company shall promptly (but in any event within thirty (30) days after receiving written notice of the same from Bank) respond to and resolve any Program-related deficiencies (to the extent under the oversight or control of Company), as may be communicated by Bank to Company in connection with Bank's quality assurance reviews, audits, or other compliance monitoring. Company's response to such Program-related inquires shall be documented in a quality log or other written tracking tool as Bank may reasonably require, and shall include Company's written summary of corrective action steps taken to resolve the issue, and the prospective steps to be taken to avoid repeated occurrences of the identified issue. Company's obligations hereunder shall include the resolution of any issues related to Processing Services as may be identified by Bank.

(t)     In the event Company is approved to process for other Program Managers, Company shall obtain an annual SSAE16 Type II audit by appropriate external audits and provide Bank with a copy of the audit report upon its completion. If material deficiencies are noted in such audit report, Company shall develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Company's sole expense. Company shall keep Bank apprised of its progress in addressing the deficiencies.

(u)     Company shall also obtain an annual third party audit of its security systems for electronic information, including monitoring, penetration, and intrusion testing. Company shall provide Bank with a copy of the audit report upon its completion and, in the event material deficiencies are noted, Company shall develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Company's sole expense.

6.     DUTIES OF BANK

6.1     <u>Certification and Administrative Fees</u>. Bank shall be responsible for any annual membership fees relating to Bank Membership with any Network.

6.2     <u>Memberships in Network</u>. Bank shall use its best efforts to obtain and maintain at its sole expense the required license with each applicable Network, and shall timely pay all normal fees, dues, and assessments associated therewith. Any fees, fines, or charges assessed by any Network as a result of the failure of any aspect of the Program to comply with the Rules shall be the responsibility of Company. Bank shall retain its Membership in Network in good standing and shall abide in all material respects by all the rules and regulations applicable to Bank; provided, however, that Bank shall not be obligated to maintain such Membership. If Bank elects to terminate its membership in any Network, or if a Network elects to terminate Bank's Membership in spite of Bank's compliance with the applicable Rules, Bank shall give notice to Company as soon after it provides notice to or receives notice from the Network according to the Rules.

6.3     Activity and Funding Accounts. Bank shall open and maintain an Activity Account and a Funding Account for purposes of receiving Cardholder funds and Settlement in connection with a Program. All Load Amounts that have been paid by or on behalf of Cardholders for the Cards, but that have not yet been used by the Cardholder, shall be maintained in the Activity Account in a fiduciary manner. The Activity Account serves as a trust or custodial account associated with the Card Program, and the name of such Activity Account shall indicate that the funds are being held for such purpose. The identities of each of the Cardholders for whose benefit such funds are being held, and the corresponding Cardholder Account balances, shall be readily identifiable by Bank.

6.4     Card Issuance. Bank shall establish Cardholder Accounts and issue Cards in accordance with this Agreement, and subject to Applicable Law and Network Rules, with the understanding that the Cards are, and shall at all times remain, the property of Bank. Nothing herein shall be interpreted to require Bank to establish a certain number of Cardholder Accounts, and Bank shall have the right to terminate marketing and origination of new Cardholder Accounts at its discretion.

6.5     Cardholder Agreements. Bank shall provide a template for a Cardholder Agreement for the Program. The provision of such template shall be for example purposes only and shall not constitute a certification to Company of any kind. Company shall remain responsible to ensure that the Cardholder Agreement complies with Applicable Law.

6.6     Notices. Bank shall deliver to Company a copy of all material notices or correspondence that it receives from any Network, or any other third party, relating to this Agreement, within five (5) business days of receipt of such notice or correspondence.

6.7     Changes to Rules Adopted by Bank. Bank may adopt new Rules relating to the published policies and procedures of Bank or change existing Rules relating to the policies and procedures of Bank from time to time by giving sixty (60) days' prior written notice to Company.

7.  REPRESENTATIONS AND WARRANTIES OF BANK

7.1     Representations and Warranties. Bank represents and warrants to Company as follows:

(a)     This Agreement is valid, binding and enforceable against Bank in accordance with its terms, except as such enforceability may be limited by laws governing creditors' rights and general principles of equity.

(b)     Bank is a national bank, validly chartered and in good standing under the laws of the United States, and is duly qualified and is properly licensed to do business in each jurisdiction in which the nature of Bank's activities makes such authorization or licensure necessary. Neither the execution of this Agreement nor Bank's performance of its obligations hereunder requires any consent, authorization, approval, notice to, license, or other action by or in respect of, or filing with, any third party or any Regulatory Authority.

(c)     Bank has the full power and authority to execute and deliver this Agreement and to perform all its obligations under this Agreement. The provisions of this Agreement and the performance by Bank of its obligations under this Agreement are not in conflict with Bank's charter, bylaws or any other agreement, contract, lease or obligation to which Bank is a party or by which it is bound.

(d)     Neither Bank nor any principal of Bank has been subject to the following:

(i)     Criminal conviction (except minor traffic offenses and other petty offenses) in the United States of America or in any foreign country;

(ii)    Federal or state tax lien, or any foreign tax lien;

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

Rev. May 2013
© 2010 Sunrise Banks, St. Paul, MN

(iii)    Administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade Commission, federal or state bank regulator, or any other state or federal regulatory agency in the United States or in any other country; or

(iv)    Restraining order, decree, injunction, or judgment in any proceeding or lawsuit, alleging fraud or deceptive practice on the part of Bank or any principal thereof.

(e)    There is not pending or threatened against Bank any litigation or proceeding, judicial, tax or administrative, the outcome of which might materially adversely affect the continuing operations of Bank.

## 8.    PROGRAM FEES AND COMPENSATION

8.1    <u>Program Fees</u>. Each Party will be entitled to and responsible for, those fees and charges as set forth in EXHIBIT A or any Program Addendum. At any time after the first anniversary of the effective date of the Agreement, Bank may amend EXHIBIT A and adjust Transaction Fees, Bank Costs and Expenses, and the Fees and Assessments on an annual basis upon providing at least sixty (60) calendar days' written notice to Company. The adjustments shall not exceed, in aggregate, the greater of (i) an annual rate of three percent (3%), or (ii) the change to the Employment Cost Index over the applicable period as published by the United States Department of Labor, Bureau of Labor Statistics, or similar index in the event the Employment Cost Index is no longer calculated and reported.

8.2    <u>Set-Off Authorization</u>. Company hereby grants and authorizes Bank to exercise a right of set-off against Company revenue, including authorizing Bank to offset any of Company's accounts maintained at Bank for any losses incurred by Bank, including but not limited to any amounts necessary to fund any Load Failures and any sums owed pursuant to EXHIBIT A. Notwithstanding the foregoing, prior to offsetting to recover a sum owed noted on an invoice provided to Company, Bank agrees to notify CardEx seven (7) business days prior to affecting the set-off, and in good faith discuss an alternative resolution.

## 9.    TERM OF AGREEMENT

9.1    <u>Term and Termination of Agreement Without Cause</u>. The term of this Agreement shall commence from the Effective Date as stated therein, and shall continue for Five (5) years (the "Initial Term"), unless terminated earlier as provided below. After the Initial Term, this Agreement shall automatically extend for additional one-year periods (each a "Renewal Term"). Either Party may terminate this Agreement at the end of the Initial Term or at the end of a Renewal Term by providing written notice to the other at least ninety (90) days in advance of the expiration of the Initial Term or such Renewal Term, or as provided below.

9.2    <u>Termination of Agreement</u>.

(a)    Either Party shall have the right to terminate this Agreement for cause:

(i)    In the case of any breach of any duty or obligation under this Agreement involving the payment of money (excluding Load Failures), but only if the breach continues for a period of seven (7) business days after the breaching Party receives written notice from the other Party specifying the breach. In the case of any breach based on a Load Failure, but only if the breach continues for a period of more than three (3) business days after Company receives written notice from Bank specifying the Load Failure. In the event such breaches are not cured during the specified period, then this Agreement may be terminated.

(ii)    In the case of a breach of any duty or obligation under this Agreement <u>not involving the payment of money</u>, (so long as such breach is not due to the actions or inaction of the

terminating Party) but only if the breach continues for a period of thirty (30) days after the breaching Party receives written notice from the non-breaching Party specifying the breach. In the event such breach is not cured during the period, then this Agreement may be terminated.

(iii)    Repeated breach of the Agreement shall not entitle the breaching party to additional cure periods. In the event of a subsequent breach of the same provision within any 12 calendar month period, the non-breaching Party may terminate this Agreement immediately upon written notice and no later than five (5) business days following the breach.

(b)    Either Party may immediately terminate this Agreement upon written notice to the other in the event of the following:

(i)    Discovery that any financial statement, representation, warranty, statement or certificate furnished to it by the other Party in connection with or arising out of this Agreement is materially adverse to the terminating Party and intentionally untrue as of the date made.

(ii)    Subject to Applicable Law, the commencement by either Party of any proceeding or filing of any petition seeking relief under Title 11 of the United States Code or any other Federal, state or foreign bankruptcy, insolvency, liquidation or similar law; application for or consenting to the appointment of a receiver, trustee, custodian, sequestrator or similar official for such Party or for a substantial part of its property or assets; a general assignment for the benefit of creditors; or taking corporate action for the purpose of effecting any of the foregoing.

(iii)    Subject to Applicable Law, the commencement by either Party of an involuntary proceeding or the filing of an involuntary proceeding or the filing of an involuntary petition in a court of competent jurisdiction seeking: relief in respect of the other Party, or of a substantial part of its property or assets under Title 11 of the United States Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law; the appointment of a receiver, trustee, custodian, sequestrator or similar office for the other Party or for a substantial part of its property or assets; or the winding up or liquidation of the other Party, if such proceeding or petition shall continue un-dismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall continue unstayed and in effect for sixty (60) days.

(iv)    Upon any change to or enactment of any Applicable Law or Rules which would render any portion of the Program illegal, or otherwise have a material adverse effect upon the Program; provided, however, that if such change does not materially affect a particular Program, that unaffected Program and this Agreement with respect thereto shall not be terminated.

(v)    Upon direction from any Regulatory Authority to cease or materially limit performance of the obligations under this Agreement, or upon the conclusion of Bank's board of directors that the continued performance by Bank is inconsistent with safe and sound banking practices.

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

9.3     <u>Company Purchase Options; Bank Wind-down or Retention.</u>

(a)     <u>Company Purchase Option.</u> Upon termination of this Agreement (i) after expiration of the applicable term under Section 9.1, (ii) by Company for cause under Section 9.2(a), or (iii) by Company under Sections 9.2(b)(i), 9.2(b)(ii), or 9.2(b)(iii), Company shall have the right, subject to the notice requirements herein, to transfer all of the Cardholder Accounts and direct their transfer to a successor qualified financial institution. Company shall provide written notice of its decision to exercise this option at least thirty (30) days prior to termination of this Agreement after expiration of the applicable term under Section 9.1 or within ten (10) business days of notifying Bank of termination of the Agreement under Section 9.2(a) or 9.2(b)(i), (ii), or (iii). Company may only exercise its option set forth herein if Company is in compliance with all of the terms and conditions of this Agreement. In the event Company exercises its option to purchase the Cardholder Accounts, Company shall close the purchase of the Cardholder Accounts within one hundred and eighty (180) days of the termination of the Agreement. Prior to the closing date, Company shall provide Bank with a detailed outline of its intentions in connection with the Cardholder Accounts, including the identity of the successor financial institution, the transition procedures for the transfer, and any other information reasonably requested by Bank. Company shall reimburse Bank for all expenses incurred by Bank in connection with the purchase of the Cardholder Accounts, including, but not limited to, any conversion costs payable to any third party processor performing Processing Services with respect to the Cardholder Accounts, Bank's reasonable attorneys' fees incurred in connection with the transfer, and all other out-of-pocket costs and expenses incurred by Bank in connection with the transfer of the Cardholder Accounts. Company shall ensure that all aspects of the transfer are accomplished in compliance with Applicable Law. Company shall remain in compliance with all provisions of this Agreement, including the maintenance of the appropriate balances in the Activity Account and the Reserve Account, and the timely payment of all other fees and sums called for under this Agreement through the date of purchase. Provided Company complies with the provisions of this subsection, Bank shall transfer the remaining Cardholder Account balances to the successor financial institution at closing.

(b)     <u>Bank Retention or Termination.</u> In the event (i) Company fails to provide effective notice of its intent to purchase the Cardholder Accounts as set forth in subsection (a) of this Section 9.3, (ii) Company provides notice of its exercise of its option under Section 9.3(a) but fails to close its purchase of the Cardholder Accounts within one hundred and eighty (180) days after termination of the Agreement, or (iii) the Agreement is terminated by Bank for cause pursuant to Section 9.2(a) or 9.2(b), Bank may at its sole discretion terminate the Cardholder Agreements, continue the same and retain the benefits thereof, or sell the Cardholder Accounts (and all rights and benefits thereof) to a successor company. Unless Bank elects to continue the Cardholder Agreements or sell the same to a third party, this Agreement shall continue in full force and effect until all Cardholder Agreements are terminated, but in no event exceeding one hundred and eighty (180) days from the termination of this Agreement. During said time, Bank shall be entitled to withhold and pay directly all Program expenses from Program Revenues including the costs of all necessary servicing and processing for the Cards. In such event, Bank shall have no further obligation to accept any new Cardholder Accounts from Company. In the event Bank elects to continue the Cardholder Accounts or sell the same to a third party, Bank shall so notify Company and Company's rights in connection with the Cardholder Accounts originated under this Agreement shall thereafter be immediately terminated. In such event, however, Company shall remain liable for any obligations owed to Bank under this Agreement. Upon termination of this Agreement, and repayment in full of all obligations of Company owed to Bank, and Bank's reasonable determination that no additional sums are likely to be owed by Company to Bank in connection with this Agreement, Bank shall return any remaining amount held in the Reserve Accounts to Company.

9.4     <u>Damages Upon Early Termination.</u>

(a)     The Parties agree that the pricing under this Agreement was determined by mutual agreement based upon certain assumed volumes of processing activity and the length of the term of this Agreement. The Parties further agree that it would be difficult or impossible to ascertain Bank's actual damages for breach of this Agreement by Company resulting in a termination of this Agreement before the end of the Initial Term. The Parties further agree that in the event of a termination by Company without cause or a termination by Bank for cause, the

Rev. May 2013
© 2010 Sunrise Banks, St. Paul, MN

Bank is entitled to: (i) all fees earned but not paid prior to the date of termination, (ii) any direct costs incurred as a result of the termination, deconversion and/or change-over; and (iii) depending on the terms of _Exhibit A_, an amount equal to fifty percent (50%) of the Transaction Fees and Assessments paid to Bank in the preceding six (6) months prior to Termination. Company agrees the foregoing represents a reasonable estimation of the actual damages Bank would suffer if Bank did not receive the expected benefits to be derived from this Agreement for the full Initial Term.

(b)      Each Party acknowledges and agrees, after taking into account the terms of this Agreement and all relevant circumstances at the date hereof, that the liquidated damages payable under this Section 9.4 represent a reasonable and genuine pre-estimate of the damages which would be suffered by Bank in the event of early termination of this Agreement and that the same do not constitute a penalty.

(c)      Nothing in this Agreement shall limit the right of any Party to this Agreement to seek injunctive relief, to the extent available, with respect to breaches of this Agreement.

10.      CONFIDENTIALITY

10.1      Confidential Information. The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever which (a) a Party ("Discloser") discloses, in writing, orally or visually, to the other Party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and which (b) relates to (i) the Discloser, (ii) in the case of Company, Bank and its customers and/or associates, or (iii) consumers who have made Sensitive Customer Information available to Bank and/or Company. "Sensitive Customer Information" shall include "non-public personal information" as defined in the Gramm-Leach-Bliley Act and implementing regulations; including, without limitation, a consumer customer's name, address, or telephone number in conjunction with the customer's social security number, driver's license number, account number, credit or debit card number, or a personal identification number or password that would permit access to the customer's account, or any combination of components of customer information that would allow someone to log onto or access a customer's account, such as a username and password, password and account number, Transaction information regarding the Cardholder Account, or any other information provided to Bank or Company by a consumer in connection with the Program.

10.2      Sensitive Customer Information. Company acknowledges that Bank has a legal responsibility to its customers to keep Sensitive Customer Information strictly confidential in accordance with Applicable Law. Bank acknowledges that Company has a responsibility to do likewise. In addition to the other requirements set forth in this Section regarding Confidential Information, Sensitive Customer Information shall also be subject to the additional restrictions set forth in this Subsection. The Recipient shall not disclose or use Sensitive Customer Information other than to carry out the purposes for which the Discloser or one of its affiliates disclosed such Sensitive Customer Information to Recipient. Recipient shall not disclose any Sensitive Customer Information other than on a "need to know" basis and then only to: (a) affiliates of Discloser; (b) its employees or officers; (c) affiliates of Recipient provided that such affiliates shall be restricted in use and re-disclosure of the Sensitive Customer Information to the same extent as Recipient; (d) to carefully selected subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the terms hereof; (e) to independent contractors, agents, and consultants hired or engaged by Recipient, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; or (f) pursuant to the exceptions set forth in 15 U.S.C. 6802(e) and accompanying regulations which disclosures are made in the ordinary course of business. The restrictions set forth herein shall apply during the term and after the termination of this Agreement. For the purposes of this Section, Cardholders shall be considered customers of Bank.

10.3      Compliance with Privacy Laws. Each Party shall comply with Applicable Law with regard to privacy of Sensitive Customer Information.

EXHIBIT A

10.4    Disclosure to Employees and Agents. Each of the Parties, as Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that Confidential Information will not be disclosed or made available to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) Resellers, subcontractors and other third-parties specifically permitted under this Agreement, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; (c) independent contractors, agents, and consultants hired or engaged by Bank, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; and (d) as required by law or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination of this Agreement. Prior to any disclosure of Confidential Information as required by law, the Recipient shall (i) notify the Discloser of any actual or threatened legal compulsion of disclosure and any actual legal obligation of disclosure immediately upon becoming so obligated, and (ii) cooperate with the Discloser's reasonable, lawful efforts to resist, limit or delay disclosure. Nothing in this Section shall require any notice or other action by Bank in connection with requests or demands for Confidential Information received from any Regulatory Authority.

10.5    Information Security. Each Party warrants that it has established an information security program which contains appropriate measures designed to (i) ensure the security and confidentiality of Sensitive Customer Information; (ii) protect against any unanticipated threats or hazards to the security or integrity of such information; and (iii) protect against the unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer. Company agrees to provide a copy of Company's information security plan for Bank's review and inspection upon request. In the event a Party discovers any unauthorized access to any Sensitive Customer Information, such Party shall take appropriate actions to address such unauthorized access, including but not limited to promptly notifying the other Party of any such incident.

10.6    Return/Destruction of Materials. Upon the termination of this Agreement, or at any time upon the request of a Party, the other Party shall return or, at the requesting Party's election, destroy all Confidential Information, including Sensitive Customer Information, in the possession of such Party or in the possession of any third party over which such Party has or may exercise control.

10.7    Exceptions. With the exception of the obligations related to Sensitive Customer Information, the obligations of confidentiality in this Section shall not apply to any information which a Party rightfully has in its possession when disclosed to it by the other Party, information which a Party independently develops, information which is or becomes known to the public other than by breach of this Section or information rightfully received by a Party from a third party without the obligation of confidentiality.

10.8    Media Releases. All media releases, public announcements and public disclosures by either Party, or their representatives, employees or agents, relating to this Agreement or the name or logo of Company, Bank, any Bank affiliate or supplier, including, without limitation, promotional or marketing material, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing Party, shall be coordinated with and approved by the other Party in writing prior to the release thereof.

10.9    Injunctive Relief. The Parties acknowledge that in the event either Party breaches the terms of this Section 10, the non-breaching Party shall be entitled to injunctive relief in addition to any other remedies that may be available to it at law or under the terms of the Agreement.

11.    INSURANCE

11.1    Required Insurance Coverage. Company shall, at its own cost and expense, obtain and maintain in full force and effect, with financially sound and reputable insurers having A.M. Best ratings of at least A- (VII) or better, insurance to cover Company's obligations under this Agreement. Upon execution of this Agreement and before the commencement of any services contemplated under the Agreement, Company shall provide the Bank with a certificate or certificates of insurance evidencing the following coverages and amounts with such insurers:

(a)     Commercial General Liability. Including products, completed operations liability and personal injury, contractual liability and broad form property damage liability coverage for damages to any property with a minimum combined single limit of $1,000,000 per occurrence and $2,000,000 general aggregate per location for bodily injury, death, property damage and personal injury.

(b)     Business Automobile Coverage. Covering use of any owned, non-owned, and hired automobiles with a minimum combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability.

(c)     Workers' Compensation Coverage. Including occupational illness or disease coverage, or other similar social insurance in accordance with the laws of each State in which services are performed; and Employer's Liability Insurance with a minimum limit of $250,000 per occurrence.

(d)     Umbrella Liability.  Coverage with a minimum limit of $3,000,000.

(e)     All Risk Property Insurance. Includes Electronic Data Processing coverage on equipment, data, media and valuable papers, including extra expense coverage, with a minimum limit adequate to cover those risks on a replacement cost basis.

(f)     Employee Dishonesty and Computer Fraud. Covering loss arising out of or in connection with any fraudulent or dishonest acts committed by the employees, officers, or agents of Company, acting alone or in collusion with others, in a minimum amount of $5,000,000. Coverage will include the processing provided by Company and/or third parties Company chooses to maintain, emboss, or distribute Cards.

(g)     Professional Liability. Covering the liability for financial loss due to act, error, omission, and negligence of any professional services performed in connection with this Agreement or any Program Addendum, in a minimum amount of $1,000,000.

(h)     Technology, Media, Network Security & Privacy Coverage. Coverage for liability arising out of rendering or failure to render technology services; failure of network security; and failure to handle, manage, store, destroy or otherwise control confidential or personal information, in a minimum amount of $5,000,000.

The foregoing insurance coverages will be primary and non-contributing with respect to any other insurance or self-insurance that may be maintained by Bank.

11.2    Additional Insurance Requirements.

(a)     Company shall cause its insurers or its representatives to issue certificates of insurance evidencing that the coverages under this Agreement are maintained in force, and the Company will provide not less than thirty (30) days written notice to Bank prior to any cancellation of any of the policies.

(b)     Company shall cause its insurers to name Bank, its officers, agents, employees, subsidiaries, and affiliates as additional insureds for Section 11.1(a) and (b) above.

(c)     Company shall cause its insurers to name Bank as loss payee for Section 11.1(f), (g) and (h) above.

(d)     Company's insurers will waive any rights of subrogation they may have against Bank arising in relation to the subject matter of this Agreement.

(e)     Company shall provide such policies of insurance to Bank for Bank's review and approval.

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

11.3    No Warranty. No warranty is provided that the coverages and limits listed in this Section are adequate to cover and protect the interests of Company. These are solely minimums that have been set to protect the interests of the Bank. Company will be fully responsible for risk of loss of, and damage to, any building, equipment, software or other materials owned or leased by it and used in providing the services in the Agreement.

## 12.    LIMITATION OF LIABILITY

12.1    No Special Damages. UNLESS OTHERWISE AGREED, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, EVEN IF SUCH PARTY HAS KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT; PROVIDED, HOWEVER, THAT THE LIMITATIONS SET FORTH IN THIS SECTION SHALL NOT APPLY TO OR IN ANY WAY LIMIT THE INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT.

12.2    Disclaimers of Warranties. BANK SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES.

12.3    Liabilities of Company for Network and Regulatory Claims. Company shall be liable to Bank for any and all liabilities and every loss, claim, demand, and cause of action (including, without limitation, the cost of investigating the claim, the cost of litigation and reasonable attorneys' fees, whether or not legal proceedings are instituted and whether paid or incurred ("Loss"), as the case may be) by or on behalf of any Cardholder as a result of Company's failure (or the failure of any Reseller or other agent of Company) to comply with the Rules or Applicable Law.

## 13.    GENERAL PROVISIONS

13.1    Indemnification.

(a)    Company covenants and agrees to indemnify and hold harmless Bank, its parent, subsidiaries or affiliates, and their respective officers, directors, employees and permitted assigns, as such, against any direct losses or expenses arising from any legal action, claim, demand or proceedings brought against any of them by any third party as a result of any misrepresentation, breach of warranty, or failure to fulfill a covenant of this Agreement on the part of Company, Company's breach of any agreement with any third party, any act or omission of Company or its providers, including any Resellers, third-party processors, merchants, Program affiliates, servicers or any other person or entity, which violates any Rules or Applicable Law, any claim relating to obligations owed to or by Company or any third party retained by it, or any claim by a Cardholder, prospective Cardholder, or Regulatory Authority relating to the Program; provided, that this provision shall not apply if such claim arises out of (i) an act of fraud, embezzlement or criminal activity by Bank, (ii) gross negligence, willful misconduct or bad faith by Bank, or (iii) the failure of Bank to comply with, or to perform its obligations under, this Agreement.

(b)    Bank covenants and agrees to indemnify and hold harmless Company and its parent, subsidiaries or affiliates, and their respective officers, directors, employees, and permitted assigns, as such, against any direct, losses or expenses arising from any legal action, claim, demand, or proceedings brought against any of them as a result of any misrepresentation, breach of warranty or failure to fulfill a covenant of this Agreement on the part of Bank, or any claim relating to obligations owed to or by Bank or any third party retained by it (except to the extent that Company has agreed to fulfill such obligation under this Agreement); provided, that this provision shall not apply if such claim arises out of (i) an act of fraud, embezzlement or criminal activity by Company or its representatives, (ii) gross negligence, willful misconduct or bad faith by Company or its representatives, or (iii) the failure of Company or its representatives to comply with, or to perform its obligations under, this Agreement.

(c)      If any claim or demand is asserted against any Party or Parties (individually or collectively, the "Indemnified Party") by any person who is not a Party to this Agreement in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections (a) or (b) above, written notice of such claim or demand shall promptly be given to any Party or Parties (individually or collectively, the "Indemnifying Party") from whom indemnification may be sought. The Indemnifying Party shall have the right, by notifying the Indemnified Party within ten (10) days of its receipt of the notice of the claim or demand, to assume the entire control (subject to the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice) of the defense, compromise or settlement of the matter, including, at the Indemnifying Party's expense, employment of counsel of the Indemnifying Party's choice. Any counsel retained by the Indemnifying Party for such purposes shall be reasonably acceptable to the Indemnified Party. The Indemnifying Party shall institute and maintain any such defense diligently and reasonably and shall keep the Indemnified Party fully advised as to the status thereof. If the Indemnifying Party gives notice to any Indemnified Party that the Indemnifying Party will assume control of the defense, compromise or settlement of the matter, the Indemnifying Party will be deemed to have waived all defenses to the claims for indemnification by the Indemnified Party with respect to that matter. The Indemnified Party shall have the right to employ its own counsel if the Indemnified Party so elects to assume such defense, but the fees and expense of such counsel shall be at the Indemnified Party's expense, unless (i) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; (ii) such Indemnified Party shall have reasonably concluded that the interests of such Parties are conflicting such that it would be inappropriate for the same counsel to represent both Parties or shall have reasonably concluded that the ability of the Parties to prevail in the defense of any claim are improved if separate counsel represents the Indemnified Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party), and (iii) the Indemnifying Party shall have reasonably concluded that it is necessary to institute separate litigation, whether in the same or another court, in order to defend the claims asserted against it; or (iv) the Indemnifying Party shall have not employed counsel reasonably acceptable to the Indemnified Party to take charge of the defense of such action after electing to assume the defense thereof and, in any such event, such reasonable fees and expenses shall be borne by the Indemnifying Party. Any damages to the assets or business of the Indemnified Party caused by a failure of the Indemnifying Party to defend, compromise or settle a claim or demand in a reasonable and expeditious manner, after the Indemnifying Party has given notice that it will assume control of the defense, compromise or settlement of the matter, shall be included in the damages for which the Indemnifying Party shall be obligated to indemnify the Indemnified Party.

(d)      The provisions of this Section 13.1 and of Section 13.2 shall survive termination or expiration of this Agreement.

13.2    Disclosure.

(a)      Each Party shall promptly notify the other of any action, suit, proceeding, facts and circumstances, and the threat of reasonable prospect of same, which might give rise to any indemnification hereunder or which might materially and adversely affect either Party's ability to perform this Agreement.

(b)      Each Party represents and warrants to the other that it has no knowledge of any pending or threatened suit, action, arbitration or other proceedings of a legal, administrative or regulatory nature, or any governmental investigation, against it or any of its affiliates or any officer, director, or employee which has not been previously disclosed in writing and which would materially and adversely affect its financial condition, or its ability to perform this Agreement.

13.3    Legal Compliance. Each Party represents and warrants to the other that it is familiar with the requirements of all Applicable Law, including consumer protection laws applicable to it which relate to the Program and its obligations hereunder, and agrees that it will use commercially reasonably efforts to maintain familiarity and to comply, in all material respects, with all such laws and regulations and all other Applicable Laws and regulations relating to its activities under this Agreement, now and in the future. The provisions of this Section

13.3 shall not, however, alter the responsibilities of the Parties to ensure compliance as detailed in separate sections of this Agreement.

13.4     Relationship of Parties. Bank and Company agree they are independent contractors to each other in performing their respective obligations hereunder. Nothing in this Agreement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, Bank and Company to be treated as partners, joint ventures, or otherwise as joint associates for profit.

13.5     Exclusivity. Nothing in this Agreement shall prohibit Bank or Company from operating any other programs in addition to the Program. Company shall not, however, provide general Processing Services for any prepaid card programs where the Cards are issued by Bank unless Company is also the program manager responsible for the development, marketing, and servicing of the Cards in a fashion consistent with Company's duties under this Agreement.  Nothing herein shall limit Company's ability to provide Processing Services in connection with Cards issued by other banks.

13.6     Regulatory Examinations and Financial Information. Company agrees to submit to any examination which may be required by any Regulatory Authority with audit and examination authority over Bank, to the fullest extent of such Regulatory Authority. Company shall also provide to Bank any information, which may be required by any Regulatory Authority in connection with their audit or review of Bank or the Program, and shall reasonably cooperate with such Regulatory Authority in connection with any audit or review of Bank. Company shall also secure and contractually protect the right of Bank and any Regulatory Authority to audit the books and records of any thirty party processor, Reseller, or other third party service provider involved in the Program. Company shall furnish Bank, at Company's expense, with Company's audited financial statements prepared by a certified public accountant within one hundred twenty (120) days of the end of Company's fiscal year. Company shall also provide such other information as Bank, Regulatory Authorities, or the Network may from time to time reasonably request with respect to the financial condition of Company and such other information as Bank may from time to time reasonably request with respect to third parties contracted with Company. Nothing in this Agreement shall limit the right of any Party to this Agreement to seek injunctive relief, to the extent available, with respect to breaches of this Agreement.

13.7     Governing Law. This Agreement shall be governed by the internal laws, and not by the laws regarding conflicts of laws, of the State of Minnesota. Each Party hereby submits to the jurisdiction of the courts of such state, and waives any objection to venue with respect to actions brought in such courts.

13.8     Severability. In the event that any part of this Agreement is deemed by a court, Regulatory Authority, or other public or private tribunal of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent.

13.9     Force Majeure.

(a)     No Party is liable for failure to perform that Party's obligations if such failure is as a result of Acts of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telephone service.

(b)     If either Party asserts Force Majeure as an excuse for failure to perform that Party's obligation, then the nonperforming Party must prove that the Party took commercially reasonable steps to minimize delay or damages caused by foreseeable events, that the Party substantially fulfilled all non-excused obligations, and that the other Party was timely notified of the likelihood or actual occurrence of an event described in subsection (a) of this Section 13.9.

EXHIBIT A

13.10   Survival. All representations and warranties herein shall survive any termination or expiration of this Agreement.

13.11   Successors and Third Parties. Except as limited by Section 13.12, this Agreement and the rights and obligations hereunder shall bind, and inure to the benefit of the Parties and their successors and permitted assigns.

13.12   Assignments. The rights and obligations of Company under this Agreement are personal and may not be assigned either voluntarily or by operation of law, without prior written consent from Bank. Bank may assign this Agreement to any affiliated entity or such other federally-insured financial institution upon reasonable notice to Company.

13.13   Notices. All notices, requests and approvals required by this Agreement shall be in writing addressed/directed to the other Party at the address and facsimile set forth below, or at such other address of which the notifying Party hereafter receives notice in conformity with this section. All such notices, requests, and approvals shall be deemed given upon the earlier of receipt of facsimile transmission during the normal business day or actual receipt thereof. All such notices, requests and approvals shall be addressed to the attention of:

Bank to:          Sunrise Banks, N.A.
                  200 University Avenue West
                  St. Paul, MN  55103
                  Attention: Joan M. Herman, SVP, Prepaid Division
                  Fax No.: 651.259.2206

With a copy to:   Keith Gauer
                  Davenport, Evans, Hurwitz and Smith, LLP
                  206 West 14th Street
                  PO Box 1030
                  Sioux Falls, South Dakota 57101-1030
                  Fax No.: 605-335-3639

Company to:       Card Express, Inc.
                  182 Howard Street, #409
                  San Francisco, CA 94105
                  Attention: Corporate Counsel

13.14   Waivers. Neither Party shall be deemed to have waived any of its rights, power, or remedies hereunder except in writing signed by an authorized agent or representative of the Party to be charged. Either Party may, by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of the other Party to be performed or complied with. The waiver by either Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

13.15   Entire Agreement; Amendments. This Agreement constitutes the entire Agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought.

13.16   Counterparts. This Agreement may be executed and delivered by the Parties in counterpart, each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.



13.17   Disputes.

(a)   Duty to Notify. In the event of any dispute, controversy, or claim arising out of or relating to this Agreement or the construction, interpretation, performance, breach, termination, enforceability or validity thereof (hereinafter, a "Dispute"), the Party raising such Dispute shall notify the other promptly and no later than one hundred eighty (180) days from the date of its discovery of the Dispute. In the case of a Dispute relating to account or Transaction statements or similar matter, the failure of a Party to notify the other Party of such Dispute within one hundred eighty (180) days from the date of its receipt shall result in such matter being deemed undisputed and accepted by the Party attempting to raise such Dispute.

(b)   Cooperation to Resolve Disputes. The Parties shall cooperate and attempt in good faith to resolve any Dispute promptly by negotiating between persons who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration and performance of the provisions or obligations of this Agreement that are the subject of the Dispute.

(c)   Arbitration. Any Dispute which cannot otherwise be resolved as provided in paragraph (b) above shall be resolved by arbitration conducted in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereof. The arbitration tribunal shall consist of a single arbitrator mutually agreed upon by the Parties, or in the absence of such agreement within thirty (30) days from the first referral of the dispute to the American Arbitration Association, designated by the American Arbitration Association. The place of arbitration shall be a mutually agreeable neutral location. The arbitral award shall be final and binding. The Parties waive any right to appeal the arbitral award, to the extent a right to appeal may be lawfully waived. Each Party retains the right to seek judicial assistance: (i) to compel arbitration, (ii) to obtain interim measures of protection prior to or pending arbitration, (iii) to seek injunctive relief in the courts of any jurisdiction as may be necessary and appropriate to protect the unauthorized disclosure of its proprietary or confidential information, and (iv) to enforce any decision of the arbitrator, including the final award. In no event shall either Party be entitled to punitive, exemplary or similar damages.

(d)   Confidentiality of Proceedings. The arbitration proceedings contemplated by this Section shall be as confidential and private as permitted by law, provided however that Bank is permitted to disclose the proceedings to accountants, legal counsel and professional advisors. To that end, the Parties shall not disclose the existence, content or results of any proceedings conducted in accordance with this Section, and materials submitted in connection with such proceedings shall not be admissible in any other proceeding, provided, however, that this confidentiality provision shall not prevent a petition to vacate or enforce an arbitral award, and shall not bar disclosures required by any laws or regulations.

13.18   Communication. Company and Bank may rely in good faith on any document, electronic file or other electronic or telephonic communication of any kind, which appears bona fide, submitted by any appropriate person respecting any matters arising hereunder.

13.19   Set-Off and Other Bank Remedies. Subject to the limitation set forth in Section 8.2, in the event of any failure by Company to perform any of its obligations hereunder, Bank shall have all rights and remedies available to it at law or in equity except as otherwise provided herein. Without limiting the generality of the foregoing, Company grants to Bank a contractual security interest in, and acknowledges that Bank shall have a contractual and statutory right of set-off against, any and all accounts (including the Negative Balance Reserve Account, the Funding Reserve Account, and the Operational Reserve Account), funds, monies, and other properties of Company at Bank or which come into possession of Bank for the purpose of satisfying the obligations of Company hereunder. Company agrees that none of Company's deposits at Bank shall be considered "special" deposits unavailable for set-off by Bank unless Bank has specifically so agreed in a separate writing. Company further agrees that the rights and remedies of Bank described herein are in addition to all other rights which Bank may have at law or equity.

13.20 <u>Headings</u>. The various captions and section headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement. References in this Agreement to any Section are to such Section of this Agreement. To the extent possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be held to be invalid, illegal, or unenforceable, such provision shall be ineffective only to the extent of such invalidity, illegality, or unenforceability, without rendering invalid, illegal, or unenforceable the remainder of such provision or the remaining provisions of this Agreement.

IN WITNESS WHEREOF, this Agreement is executed by the Parties' authorized officers or representatives and shall be effective as of the date first above-written.

CARD EXPRESS, INC.

By: _____
2B182FDEF027450...

Name: Sean Safahi

Title: Chief Executive Officer

SUNRISE BANKS, N.A.

By: _____

Name: JOAN M HERMAN

Title: SVP

THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.

## LIST OF EXHIBITS

Exhibit A          Compensation

Exhibit B          Form of Program Addendum

Exhibit C          Processing Services

Exhibit D          Service Level Agreement

**EXHIBIT A**
**COMPENSATION**
**SUNRISE BANKS FEES**

1. **Collection of Program Revenues.** Bank and Company agree that Bank shall be entitled to collect and receive all Program Revenues (including without limitation all post-purchase fees, but excluding Load fees) generated by the Program. Bank and Company agree that Company shall be entitled to retain all Load fees. The fees and compensation to be paid to Bank and Company shall be set forth in this Exhibit A.

2. **Payment of Marketing Fee.** Subject to the provisions of this Exhibit A, Bank shall pay Company a Marketing Fee equal to the sum of the following:

   a. All Card Account Income generated by the Cardholder Accounts in the prior week;

   b. All net Interchange Fees received by Bank from a System in connection with the Programs ("Interchange" or "Interchange Fees" means the fee paid to an issuer of a Card by an acquiring financial institution for a transaction, as established by a System);

   c. Any supplemental program management fees Bank agrees to pay to Company under any applicable Program Schedule; and

   d. A variable Percentage of the Float* for the prior month for any month in which the average daily balance in the Activity Account exceeds $1,000,000, equal to the following:

   | Average Balance in Activity Account | Percentage of Float to Company |
   | --- | --- |
   | $1 million to $5 million | 25% |
   | $5 million to $15 million | 35% |
   | $15 million and up | 50% |

   *Float will not be shared unless the Federal Funds Rate equals or exceeds 1% for the applicable month.

3. **Transaction Fees.** Bank shall be entitled to Transaction fees and assessments ("Transaction Fees and Assessments") on the Cardholder Accounts based on the following:

   a. **Reloadable Cards.** For reloadable Cards, the Transaction Fees and Assessments shall be calculated as follows, with a maximum fee of $1.00/Card/month:

   | Tier | Gross Monthly Transactions | Processing Fee Per Item |
   | --- | --- | --- |
   | 1 | 0 -200,000 | $0.072 |
   | 2 | 200,001-400,000 | $0.056 |
   | 3 | 400,001-600,000 | $0.040 |
   | 4 | 600,001 – And Above | $0.030 |

   b. **Non-reloadable Gift and Incentive Card Activity Fees.** For non-reloadable gift and incentive Cards, the Transaction Fees and Assessments shall be calculated as follows:

   i. **Transaction Fees.** The Transaction Fees and Assessments shall be based on the number of Cards (whether virtual or in form of plastic Card) in each tier as follows:

   | Tier | Gross Monthly Cards | One Time Processing Fee Per Issued Card |
   | --- | --- | --- |
   | 1 | First 50k Cards per Month | $0.25 |
   | 2 | 50,001 – 250k Cards per Month | $0.20 |
   | 3 | 250,001 – 1mm Cards per Month | $0.15 |
   | 4 | 1,000,001 – 2 mm Cards per Month | $0.10 |
   | 5 | 2,000,001 + Cards per Month | $0.05 |

EXHIBIT A

ii. **Gross Load Assessment.** The Transactions Fees and Assessments for non-reloadable gift and incentive Cards shall also include a Load assessment applied based upon the gross monthly Loads in accordance with the following:

| Gross Loads | Volume Assessment Factor (multiplied by Gross Load Volume) |
|---|---|
| $0 to $150,000,000 | 15 basis points |
| $150,000,001 to $300,000,000 | 12.5 basis points |
| $300,000,001 and higher | 10 basis points |

c. **Monthly Minimum Fees (excluding network pass-through fees).** At the end of each month beginning on the last day of the seventh (7th) full month following the Effective Date, Company agrees to pay Bank each month as follows:

| | |
|---|---|
| Months 1 through 6 | No monthly minimum fees apply |
| Months 7 through 12 | The Greater of Five Thousand ($5,000) or the total of all Transaction Fees and Assessments from this Section 3 of Exhibit A |
| Months 13 through 24 | The greater of Seven Thousand and Five Hundred ($7,500) or the total of all Transaction Fees and Assessments from this Section 3 of Exhibit A from this Exhibit |
| Months 25 through 30 | The greater of Ten Thousand ($10,000) or the total of all Transaction Fees and Assessments from this Section 3 of Exhibit A |
| Months 30 plus | The greater of Twenty Thousand ($20,000) or the total of all Transaction Fees and Assessments from this Section 3 of Exhibit A |

d. **Transaction Definition.** For purposes of this Exhibit A, the term "Transactions" shall include initial card funding, all Settled Association Transactions, bill payment, ACH including origination and receiving, Account to Account, or Card to Card Transactions processed under this Agreement, including, but not limited to, the following:

Settled Association Transactions:
Domestic and International POS (Point of Sale) transactions
Domestic and International Non-Monetary ATM transactions
Domestic and International Monetary ATM transactions

4. **Bank Costs and Expenses.** Company shall pay Bank the following costs and expenses:

| | |
|---|---|
| Bank Setup Fee (to include up to six dedicated Bins and 1 ICA) | Waived |
| Additional Program Setup Fee | $500 |
| ICA/Bin Setup Fees (Pass Through) | Pass Through |
| Network Fees (Pass Through) | Pass Through |
| Initial Network ISO Fee (Pass-through) | Pass Through |
| Annual Network ISO Renewal (Pass-through) | Pass Through |
| ISO/TPA Due Diligence Fee | $500 per ISO/TPA |
| Co-brander/Reseller/Employer Due Diligence Fee | $250/entity |
| Outside Legal Counsel Expense | Actual Hourly Rate |
| Signature Network Fee Assessments | Pass-through |
| PIN Network Fee Assessments | Pass-through |
| Professional Services | $150/hour |
| CIP review/validation performed by Bank, if necessary | $2.50/application |

2



5.  **Monthly Statement.**  On or before the thirtieth (30th) day of each month, Bank shall prepare and send to Company a monthly statement detailing the Program Revenues, Marketing Fee, Transaction Fees and Assessments, Bank Costs and Expenses, and any other sums owed for the prior month. Company shall be entitled to receive the difference between the Marketing Fee and the sum of the Transaction Fees and Assessments, Bank Costs and Expenses, and any other sums owed by Company to Bank under the Agreement, if said calculation produces a positive number. If said calculation produces a negative number, Company shall pay the absolute value of the calculation to Bank. Bank will execute ACH debit/credit within 5 business day of the date of the monthly statement..

6.  **All direct Network and/or Processor fees and assessments associated with Company's program(s) will be passed on to Company as billed to Bank by the networks.**

3



**EXHIBIT C**
**PROCESSING SERVICES**

Company shall provide the Processing Services, as set forth below, for each Program in accordance with the applicable Card Program:

(a)     Processing all applications and establishing all accounts in the Program, including, but not limited to, providing Cardholder Agreements, approving applications that meet Bank standards, setting up accounts, verifying Cardholder identification, screening Cardholder applicants for compliance purposes and for use in Client's customer identification program ("CIP") and OFAC verification, and authorizing Card activation. Company will maintain separate records in its database for each Cardholder Account.

(b)     Card creation, production and shipment, including: Card design, purchase and safekeeping of plastic stock, embossing and encoding of Cards, printing of Card carriers, mailing or other delivery of Cards, preparation and mailing of PIN mailers, and preparation and mailing of all other documents required to be sent to Cardholders. Such services may be provided by a third party provider approved by Bank though Company shall be responsible for all fees and costs related thereto

(c)     Company will provide services for Transactions (including, but not limited to, automated teller machine ("ATM"), point of sale ("POS"), and other Transaction types supported by Company) initiated through the use of the Cards. Transaction authorization and processing on Bank's behalf, including adjustments and corrections, settlement, and all accounting relating to Cardholder Accounts, including, but not limited to: preparation, printing and mailing of monthly and other periodic account statements, where applicable. Company will maintain a database of the available balance of funds corresponding to each Cardholder Account established under the Agreement and Company will facilitate the approval or denial of Transactions based on the applicable Cardholder Account's available balance at the time of the given Transaction and any other edit checks, including personal identification number ("PIN") verification, which Company deems reasonable to perform in connection with the Card utilized to initiate the Transaction or the Cardholder Account to which such Card is tied.

(d)     Capture and retention of all data necessary to provide timely accurate reports to all applicable Networks as well as the timely production and delivery of all required reports.

(e)     Compliance with all processing-related requirements in the Network Rules.

(f)     8:00 am to 8:00 pm Live agent customer service, Monday through Sunday (hereinafter the "Customer Service Hours").

(g)     IVR (including ability to report a card lost/stolen) and online customer service 24 hours per day and 7 days per week.

(h)     Data capture and reporting and information management services.

(i)     Cardholder Account and Transaction dispute processing and resolution.

(j)     Clear and Close Negative Balances.

(k)     Fraud prevention and security.

(l)     All mailings to Cardholders including shipping costs and postage.

(m)     Establish and maintain communication lines and related equipment.

1



EXHIBIT A

(n)     Provide Bank employees 24-hour access to Customer Service System in order to monitor Cardholder Transactions.  Should further action be required, Company agrees to immediately suspend, close, or otherwise limit the use of such Cardholder Accounts at Bank's request.  Company shall provide such access through a client portal designed specifically for program administration.  Company shall also provide Bank with appropriate 24-hour contact information (including telephone number) to allow Bank to contact Company to exercise its rights under this Section at any time.

(o)     Periodic OFAC scans for Card Programs where a Cardholder Account is opened, Card is reissued, Cardholder's address is changed, or the name of any Cardholder (or joint Cardholders) is changed.  Such scans shall compare the Cardholder identified to the Office of Foreign Assets Control's "Specially Designated Nationals ("SDN") list.

(p)     The Processing Services shall not be changed without Bank's prior written consent.  Company may make changes to its internal operations or reporting (without impacting the Processing Services required hereunder) by providing Bank thirty (30) days prior written notice.

2



**EXHIBIT D**
**SERVICE LEVEL AGREEMENT**

Bank and Company agree that this Service Level Agreement shall be applicable to all matters relating to Company's provision of services in connection with the Cardholder Accounts and the Program, including services for which Company retains third party service providers.

1.1    Authorization System Availability

(a)    The on-line authorization system will be available (via primary or back-up service) to authorize transactions 99.75% of the total minutes in each calendar month, excluding downtime for Scheduled Maintenance. The on-line authorization system will be considered to be "available" if it is capable of responding to a request for authorization of a transaction initiated using a Stored Value Card.

(b)    The on-line authorization system availability Service Level will be calculated as follows: 100 * (Total minutes the on-line authorization system is available in a calendar month) / (Total minutes in such calendar month - downtime for Scheduled Maintenance).

1.2    Web Site Availability

(a)    The websites maintained by or on behalf of Company by which Cardholders can review balance information or transaction history (each, a "Program Website"), will be available 99.0% of the total minutes in each calendar month, excluding Scheduled Maintenance.

(b)    The Program Website Service Level will be calculated as follows: 100 * (Total minutes the Program Website is available in a calendar month)/ (Total minutes in such calendar month - downtime for Scheduled Maintenance).

1.3    Report Availability

(a)    Measured monthly, standard reports and the Bank flat files will be made available each day by 9 a.m. Central time. However, this Service Level shall not apply in the case of Scheduled Maintenance.

(b)    Custom reports may be included in this Service Level upon mutual agreement after six months of production experience.

(c)    Reports will have been considered to be have been made available unless Bank reports to Company that one or more reports is not available by noon Central time or Bank or Company discovers that the reports were delivered with incomplete or unusable data and Company confirms that one or more reports is not available or contains incomplete or unusable data.

1.4    IVRU Availability (Upon Availability)

(a)    The IVRU will be available to respond to Cardholder inquiries 98% of the total minutes in the calendar month, excluding downtime for Scheduled Maintenance.

(b)    The IVRU availability Service Level will be calculated as follows: 100 * (Total minutes the IVRU is available in a calendar month) / (Total minutes in such calendar month - downtime for Scheduled Maintenance).

1.5    Call Center Services

(a)    Customer Service Call Handling:

1

   (i) Eighty percent (80%) of all live customer services calls answered by Company each calendar month thereafter will be answered within one hundred and eighty (180) seconds.

   (ii) This Service Level will be calculated as follows:  100 * (total number of live customer service calls received by Company at the toll free customer service telephone number designated for Cardholders that are answered within thirty (30) seconds)/ (total number of live customer service calls received by Company at the toll free customer service telephone number designated for)

  (b) Customer Service Call Handling Abandon Rate:

   (i) The abandonment rate for calls to the call center shall be less than 15%.

   (ii) 'The abandonment rate Service Level will be calculated as follows: (total number of live customer service calls received by Company at the toll free customer service telephone number designated for Cardholders for which the Cardholder hangs up after sixty (60) seconds and before the call is answered by a live customer service representative)/ (total number of live customer service calls received by Company at the toll free customer service telephone number designated for Cardholders.

## 2. General

2.1 Time of Receipt:  The time the transmission job completes in the Company data center is the time of receipt for that file.

2.2 Calendar Monthly Measurement:  Only full calendar months will be measured for purposes of these Service Levels.

2.3 Force Majeure:  No Service Level will be considered missed if the failure is due to circumstance beyond Company's reasonable control.

2.4 Scheduled Maintenance: Scheduled maintenance, includes but is not limited to weekly installs, major and minor implementations).  Scheduled maintenance will occur only during the hours 2:00 am to 9:00 am Central time.  Any maintenance conducted by Company during any other hours shall be considered unscheduled downtime.  Company will notify Bank in advance of scheduled maintenance.

2.5 Missed Service Levels:  If Company fails to provide services in accordance with the service level standards set forth in this Exhibit D, Company shall: (i) promptly investigate and report to Bank on the causes of the problem; (ii) provide a root cause analysis of such failure as soon as practicable after such failure or Bank's request; (iii) initiate remedial action to correct the problem and begin meeting the SLA as soon as practicable; and (iv) advise Bank, as and to the extent requested by Bank, of the status of remedial efforts being undertaken with respect to such problem and, as soon as practicable, provide Bank reasonable evidence that the causes of such problem have been or will be corrected on a permanent basis.  For all Service Levels missed as set forth in Section 1.3. (Report Availability), a service credit will be given to Bank for each day an SLA is missed, beyond 1 day per month.  In the event that a Service Level is missed more than 1 day per month in accordance with Section 1.3 of this Exhibit, the service credit is defined as $500 per incident for each day beyond the initial day in which a SLA is missed.  The foregoing service level ramifications shall be in addition to the breach, notice and cure, and termination rights under the Agreement.

